FILED

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
#### Alexandria Division

2011 AUG 16  P 3: 26

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| **LANSDOWNE ON THE POTOMAC** )<br>**HOMEOWNERS ASSOCIATION, INC.** )<br>  43459 Riverpoint Drive )<br>  Lansdowne, VA 20176 )<br> )<br>    **Plaintiff**, )<br> )<br>  v. )<br> )<br>**OPENBAND AT LANSDOWNE LLC**, )<br>  3725 Concorde Parkway, Suite 100 )<br>  Chantilly, VA 20153; )<br> )<br>and )<br> )<br>**LANSDOWNE COMMUNITY** )<br>**DEVELOPMENT, LLC**, )<br>  14121 Parke Long Court )<br>  Chantilly, VA 20151; )<br> )<br>and )<br> )<br>**M.C. DEAN, INC.**, )<br>  22461 Shaw Road )<br>  Dulles VA 20176; )<br>and )<br> )<br>**LCD COMMUNICATIONS LLC**, )<br>  14121 Parke Long Court )<br>  Chantilly, VA 20151; )<br> )<br>and )<br> )<br>**OPENBAND SPE, LLC**, )<br>  3725 Concorde Parkway, Suite 100 )<br>  Chantilly, VA 20153; )<br> )<br>and ) | Civil Action No. 1:11CV872<br>AJT/TCB |

| | |
|---|---|
| **OPENBAND MULTIMEDIA, LLC,** | ) |
|     22461 Shaw Road | ) |
|     Dulles, VA 20166; | ) |
| | ) |
| and | ) |
| | ) |
| **OPENBAND OF VIRGINIA, LLC,** | ) |
|     22461 Shaw Road | ) |
|     Dulles, VA 20166; | ) |
| | ) |
|     **Defendants.** | ) |
| | ) |

## COMPLAINT

Plaintiff the Lansdowne on the Potomac Homeowners Association, Inc. ("Lansdowne HOA"), by and through its undersigned counsel, submits this Complaint against Defendants OpenBand at Lansdowne LLC, Lansdowne Community Development, LLC ("LCD"), M.C. Dean, Inc., LCD Communications LLC, OpenBand SPE LLC, OpenBand Multimedia LLC, and OpenBand of Virginia LLC (collectively "Defendants").

## NATURE OF THE ACTION

1.      In 1996, Congress passed the Telecommunications Act, which was designed to open communications markets to competition and thereby reduce prices and improve service for consumers. This lawsuit arises because at a time when Congress and the Federal Communications Commission ("FCC") had decided to increase competition for telephone, video, and Internet services, the Defendants saw a golden opportunity to *eliminate* competition, reaping millions of dollars in unjustified profits.

2.      Beginning in or around 2000, and continuing through today, the Defendants have participated in a conspiracy designed to monopolize and otherwise restrain trade in the markets for various communications services, namely the market for wireline-telephone service, the

2

market for paid-television service, the market for high-speed Internet service, and bundled packages of these services (collectively the markets for "communications services") within a northern-Virginia residential development known as Lansdowne on the Potomac. To effectuate their unlawful conspiracy, the Defendants have engaged in a course of conduct that includes unlawful self-dealing, misrepresentations, and the creation of sham companies designed to evade federal laws that mandate competition.

3.     The insight behind the conspiracy is simple: when a real-estate developer creates a new neighborhood, it initially has the power to grant easements, create a homeowners association, and enter contracts on behalf of the neighborhood's future residents. These powers are supposed to be constrained by the developer's fiduciary duties to future homeowners. But in these powers, the Defendants—one of which is a partnership of real-estate developers—saw a lucrative opportunity to benefit their own interests at the expense of future homeowners: they could award a monopoly over the provision of communications services to a company of their choice, in the process earning millions of dollars in unjustified profits.

4.     The Defendants agreed that a single company—OpenBand at Lansdowne, a company in which they owned an interest—would have the exclusive and perpetual right to provide wireline communications services to the Lansdowne development.

5.     They effectuated this agreement through a brazen course of self-dealing in which agents of the Defendants, acting as the officers and directors of the Lansdowne HOA, caused the HOA to enter various anticompetitive and unconscionable agreements with OpenBand at Lansdowne, a company owned by the Defendants. In doing so, the Defendants and their agents breached their fiduciary duties to the development's future homeowners, whose interests they were legally required to protect.

6.     One of these agreements, which is renewable at the Defendants' sole discretion for up to sixty-five years, provides that OpenBand at Lansdowne will provide communications services to every resident of Lansdowne on the Potomac.

7.     And while this agreement purports to allow residents to purchase services from "any and all" other companies of their choice, this purported freedom to use other providers is illusory because the Defendants, also through self-dealing, caused the Lansdowne HOA to enter other agreements providing OpenBand at Lansdowne with the exclusive right to provide wireline communications services to the Lansdowne on the Potomac development.

8.     The Defendants thus knew that it would be difficult, if not impossible, for residents to purchase services from a competitor. The Defendants' prior agreement granting OpenBand at Lansdowne the exclusive right to service the development prevented or otherwise hindered any competitor from providing substitute wireline services and prevented the Lansdowne HOA and its residents from purchasing service or entering any agreements with an alternate wireline provider.

9.     The Defendants have largely achieved the goals of the conspiracy. Indeed, as a result of the Defendants' conspiracy, residents of Lansdowne on the Potomac are currently obligated to purchase telephone, television, and high-speed Internet access from the Defendants and are unable to purchase these services from any other wireline provider of these services.

10.     Moreover, the Lansdowne HOA is unable to contract with or provide access to the development to any other communications providers because of the threat of being sued. Indeed, in the past, the Defendants have threatened to seek criminal sanctions against an entity that sought to provide service to Lansdowne on the Potomac. And the plaintiffs have no reason to believe the Defendants' position is any different today. In fact, during a recent court hearing in a

case challenging OpenBand's exclusive right to provide communications services to another real estate development, counsel for OpenBand at Broadlands, LLC—an entity operating under the same arrangement as is at issue here—stated that if a wireline communications provider attempted to run its wire from the street to the home, "then OpenBand would take action because it has an exclusive easement and an exclusive right to provide that service to the home."

11.    Other providers are willing and would be able, but for the conspiracy and the Defendants' threat to enforce their exclusive arrangement, to provide these wireline services to the Lansdowne HOA and its residents.  In fact, one provider has stated that it would provide services to the Lansdowne community provided the Lansdowne HOA granted it an easement to do so; however, because of the scheme implemented by the Defendants, the Lansdowne HOA cannot grant the requested access.

12.    Moreover, numerous residents—many of whom have been frustrated that they receive subpar service at above-market prices—would like to purchase service from other providers.

13.    The Plaintiff files this lawsuit to put an end to this unlawful scheme.  The Plaintiff requests that the Court award the Plaintiff damages under federal and state antitrust laws, declare the Defendants' exclusivity scheme—which is anticompetitive and unconscionable and which resulted from unlawful self-dealing—void, and award other relief as detailed below.

## PARTIES

14.    Plaintiff Lansdowne on the Potomac Homeowners Association, Inc. ("Lansdowne HOA") is a Virginia non-stock corporation with its principal place of business located at 43459 Riverpoint Drive, Lansdowne, Virginia.  The Lansdowne HOA represents and acts on behalf of

its resident members, who have been and continue to be injured as a result of the Defendants' conduct alleged herein.

15.     Defendant OpenBand at Lansdowne LLC is a Virginia limited liability company with its principal place of business located at 3725 Concorde Parkway, Suite 100, Chantilly, Virginia. OpenBand at Lansdowne is jointly owned by Defendants LCD Communications (which is owned by Defendant Lansdowne Community Development) and OpenBand SPE (which is owned by Defendant M.C. Dean).

16.     Defendant Lansdowne Community Development, LLC ("LCD") is a Virginia limited liability company with its principal place of business located at 14121 Parke Long Court, Chantilly, Virginia. LCD is the developer of the residential development Lansdowne on the Potomac.

17.     Defendant M.C. Dean, Inc. is a Virginia corporation with its principal place of business located at 22461 Shaw Road, Dulles, Virginia. M.C. Dean is an engineering and integration provider for complex electrical, electronic and telecommunication systems.

18.     Defendant LCD Communications LLC is a Virginia limited liability company with its principal place of business located at 14121 Parke Long Court, Chantilly, Virginia, and is a wholly-owned subsidiary of LCD.

19.     Defendant OpenBand SPE, LLC is a Virginia limited liability company with its principal place of business located at 3725 Concorde Parkway, Chantilly, Virginia, and is a wholly-owned subsidiary of M.C. Dean.

20.     Defendant OpenBand Multimedia, LLC is a Virginia limited liability corporation with its principal place of business located at 22461 Shaw Road, Dulles, Virginia, and is a wholly-owned subsidiary of M.C. Dean. OpenBand Multimedia is a provider of multimedia

6

services and has been certified to operate an open video system in parts of Loudoun County, Virginia.

21.     Defendant OpenBand of Virginia LLC is a Virginia limited liability company with its principal place of business located at 22461 Shaw Road, Dulles, Virginia, and is a wholly-owned subsidiary of M.C. Dean.  OpenBand of Virginia is a telephone company certified to provide local exchange (local calls) and interexchange (long-distance calls) services.

### JURISDICTION AND VENUE

22.     This action arises under the laws of the United States, specifically Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Federal Communications Act, 47 U.S.C. § 151 *et seq.*, and the orders of the Federal Communications Commission, which the Court has jurisdiction to enforce pursuant to 47 U.S.C. § 401(b).  This Court has original jurisdiction over the claims arising under federal law pursuant to 28 U.S.C. § 1331.  The Plaintiff seeks damages and declaratory relief pursuant to 15 U.S.C. §§ 4, 15, and 28 U.S.C. § 2201.

23.     The Court has supplemental jurisdiction over the related claims arising under the laws of the Commonwealth of Virginia pursuant to 28 U.S.C. § 1367.

24.     Venue is proper under 28 U.S.C. § 1391(b) in the Eastern District of Virginia because the Defendants are Virginia corporations and reside within this district and each and all of the acts alleged herein were done by the Defendants within this district.

### FACTUAL ALLEGATIONS

I.  **CREATION OF THE LANSDOWNE ON THE POTOMAC DEVELOPMENT AND THE LANSDOWNE HOMEOWNERS ASSOCIATION.**

25.     In July 1999, a partnership of real-estate developers and builders, which included Centex Homes, Van Metre Companies, Beazer Homes, and John Laing Homes, created LCD for

the purpose of planning, constructing, and developing the residential community known as Lansdowne on the Potomac located in Loudoun County, Virginia.

26.     Lansdowne on the Potomac is a centrally managed residential real-estate development comprising approximately 850 acres of land along the Potomac River on which are located 2155 single-family attached and detached homes. Residents of Lansdowne on the Potomac own their homes, and each dwelling space is distinctly separate, but all residents share an interest in common spaces that require central management.

27.     In December 2000, LCD, as the Declarant, formed the Lansdowne HOA to provide for and assure the maintenance, preservation, and architectural control of the Lansdowne development. Specifically, the Lansdowne HOA was formed for the purpose of, *inter alia*, exercising all of the powers and privileges and performing all of the duties and obligations of the Association; fixing, levying, collecting, and enforcing payment by any lawful means of all charges and assessments; and paying all expenses of the Lansdowne HOA.

28.     During the construction and development of Lansdowne on the Potomac, and throughout the relevant period, the affairs of the Lansdowne HOA were managed by a Board of Directors appointed, controlled, and influenced by LCD.

29.     The Lansdowne HOA is professionally managed by Community Management Corporation ("CMC") of Chantilly, Virginia. CMC provides the Lansdowne HOA with a general manager, along with permanent staff members, who handle covenants, communications, events, and facilities and grounds maintenance.

## II.     THE DEFENDANTS CONSPIRE TO RESTRAIN TRADE AND MONOPOLIZE COMMUNICATION SERVICES.

30.     In or around 2000, the Defendants conspired and agreed that M.C. Dean, through its wholly-owned subsidiaries, would monopolize and otherwise restrain competition in the

markets for communications services in Lansdowne on the Potomac, and M.C. Dean would share the revenue with LCD. To effectuate their agreement, the Defendants devised a scheme whereby the residents of the Lansdowne community would be able to purchase wireline telephone, video, and Internet services from only one provider—an entity to be created and jointly owned by LCD and M.C. Dean.

31.     Federal law, however, requires that certain types of communication providers, such as telephone companies, grant other communications providers access to their rights of way for the purpose of installing and operating the other provider's communication facilities. *See, e.g.*, 47 U.S.C. § 224(f). Because the Defendants intended to provide telephone services along with other communication services, they would be required by law to provide potential competitors access to their rights of way. To circumvent this federal law and further their unlawful agreement, LCD and M.C. Dean agreed to create various subsidiaries and affiliated companies. Through these sham subsidiaries and their various agreements described herein, the Defendants vested the rights of way necessary to provide services to individual homes in entities they hoped to argue were not subject to the nondiscriminatory access requirements of federal law.

32.     LCD and M.C. Dean also agreed that LCD, through its control and influence of the Lansdowne HOA Board of Directors, would cause the Lansdowne HOA to enter and execute the various agreements necessary to effectuate the Defendants' scheme.

   **A.     LCD and M.C. Dean Create Sham Subsidiaries Through Which to Implement Their Unlawful Agreement.**

33.     Beginning in April 2000 and ending in March 2001, LCD and M.C. Dean created various wholly-owned subsidiaries for the purpose of effectuating their unlawful agreement.

34.     On April 17, 2000, M.C. Dean caused the creation of OpenBand of Virginia, Inc.,

which was subsequently merged on September 17, 2001, with Defendant OpenBand of Virginia

LLC.  OpenBand of Virginia is a telephone company certified to provide local exchange (*i.e.*,

local) and interexchange (*i.e.*, long distance) services.  OpenBand of Virginia is a wholly-owned

subsidiary of M.C. Dean.  Its registered agent is Doug Cumins, the Vice President and Chief

Financial Officer of M.C. Dean.

35.     On September 6, 2000, LCD caused the creation of LCD Communications, a

wholly-owned subsidiary of LCD.  LCD and LCD Communications share the same principal

place of business and have the same registered agent.

36.     On November, 17, 2000, M.C. Dean caused the creation of OpenBand

Multimedia.  OpenBand Multimedia is an open video system provider, and by a franchise

agreement with Loudoun County, Virginia, is permitted to provide video services to certain

subdivisions within Loudoun County.  An open video system provider is a telephone company or

other entity that is permitted by statute to use its infrastructure to provide video (*i.e.*, television)

to its subscribers.  OpenBand Multimedia is a wholly-owned subsidiary of M.C. Dean.  Its

registered agent is Doug Cumins, the Vice President and Chief Financial Officer of M.C. Dean.

37.     On March 27, 2001, M.C. Dean caused the creation of OpenBand SPE, a wholly-

owned subsidiary of M.C. Dean.  OpenBand SPE's registered agent is Joel Bonfiglio, M.C.

Dean's corporate Secretary.

38.     Also on March 27, 2001, LCD and M.C. Dean, acting through LCD

Communications and OpenBand SPE, caused the creation of OpenBand at Lansdowne.  William

Dean, the President of M.C. Dean and OpenBand SPE, is also the President of OpenBand at

Lansdowne.

39.     OpenBand at Lansdowne was created solely for the purpose of entering and effectuating various agreements granting it the exclusive right to provide communications services to the residents of the Lansdowne HOA.

40.     LCD and M.C. Dean, acting through their subsidiaries, created OpenBand at Lansdowne with the intent of evading federal laws and regulations governing certain types of telecommunication providers.  In addition, OpenBand at Lansdowne was created for the purpose of funneling kickbacks to LCD in exchange for its agreement and assistance in orchestrating and implementing the Defendants' conspiracy.

41.     LCD Communications and OpenBand SPE, which jointly own OpenBand at Lansdowne, entered an operating agreement governing their rights and obligations.

42.     Based on information and belief, the terms of the operating agreement provide that OpenBand at Lansdowne is the exclusive means by which OpenBand Multimedia and OpenBand of Virginia provide telephone, video, and Internet services to the Lansdowne community.

43.     Based on information and belief, the operating agreement further specifies the guaranteed payment (as a percentage of revenue) LCD, through LCD Communications, shall receive from the provision of communication services.

44.     The guaranteed payment was and is provided as a kickback to LCD in return for LCD using its control of and influence over the Lansdowne HOA to cause the HOA to enter and agree to various agreements.

**B.      Through Unlawful Self-Dealing, LCD Causes the Lansdowne HOA to Enter Agreements Granting OpenBand at Lansdowne the Exclusive Right to Provide Communications Services**

45.     At or around the same time that LCD and M.C. Dean were creating various sham subsidiaries, LCD began exerting its control over the Lansdowne HOA to effectuate the

11

Defendants' unlawful conspiracy. In particular, the Defendants caused the Lansdowne HOA to enter a series of agreements collectively designed to ensure that residents of Lansdowne on the Potomac would have to purchase wireline communications services from OpenBand at Lansdowne and that they could not purchase wireline communications services from any other provider.

46. The first agreement, entitled Agreement to Obtain Telecommunications Services ("the Telecommunications Services Agreement") provided that OpenBand at Lansdowne would provide basic wireline communications services to every resident of Lansdowne on the Potomac and that the Lansdowne HOA would not engage any other provider of these services.

47. The second set of agreements, which were executed the same day as the Telecommunications Services Agreement and purported to grant various exclusive "easements," awarded to OpenBand at Lansdowne "the right to be the exclusive provider of telecommunications services" to the Lansdowne on the Potomac development.

48. The third agreement, entitled Covenants, Conditions and Restrictions, contains provisions granting the Defendants the exclusive and perpetual right to provide communication services to the development. These provisions were explicitly incorporated into the prior Telecommunications Services Agreement, which provides that the Covenants, Conditions and Restrictions "are a binding obligation of the HOA and enforceable against the HOA in accordance with their terms."

49. Although these agreements were stylized as three separate documents, they were designed to work in tandem to achieve a single outcome: monopolization of the markets for communications services. The Defendants, however, fraudulently attempted to make the Telecommunications Services Agreement appear on its face to be a non-exclusive agreement by

including a provision stating that residents could obtain any services from "any and all" providers other than OpenBand at Lansdowne. This representation was and is false, and the Defendants knew and intended it to be false.

50.     In addition, the Defendants made the same fraudulent representation in the Lansdowne on the Potomac Homeowners Association Informational Brochure, which was prepared by and at the direction of LCD and provided to each prospective buyer. The brochure states that the "Buyer has the right to purchase one or more of the Mandatory Services [*i.e.*, telephone, video, and Internet] from an alternate provider or providers. For example, if Buyer wishes to obtain local telephone service from the 'incumbent local exchange carrier' (currently, Verizon), Buyer may do so . . . ."

51.     The Lansdowne HOA and its residents, however, are unable to obtain services from any other wireline providers. The Defendants ensured they would have the exclusive right to provide communication services through an amendment to the HOA's covenants, conditions, and restrictions, and exclusive and perpetual blanket "easements."

1.     **In a Brazen Case of Self-Dealing, the Defendants Cause the Lansdowne HOA to Enter The Telecommunications Services Agreement.**

52.     On May 14, 2001, Leonard S. ("Hobie") Mitchel, on behalf of the Lansdowne HOA, entered an exclusive Agreement to Obtain Telecommunications Services ("the Telecommunications Services Agreement") with OpenBand at Lansdowne. William Dean, the President of M.C. Dean, signed the Agreement on behalf of OpenBand at Lansdowne. A copy of the Agreement is attached hereto and incorporated by reference. *See* Exhibit 1.

53.     The Telecommunications Services Agreement provides that OpenBand at Lansdowne (or any third party provider it may engage, *e.g.*, OpenBand of Virginia and

OpenBand Multimedia), will be the exclusive provider of "Platform Services" — defined as basic wireline telephone, video, and Internet services — to the Lansdowne HOA.

54. The Telecommunications Services Agreement obligates the Lansdowne HOA to pay OpenBand at Lansdowne for these services provided to the development's homeowners. The homeowners, in turn, must pay monthly dues to the Lansdowne HOA for OpenBand at Lansdowne's communication services, regardless of whether they use them. The Agreement also states that the Lansdowne HOA must pay OpenBand at Lansdowne irrespective of whether the homeowners pay their dues.

55. At the time Hobie Mitchel entered the Telecommunications Services Agreement on behalf of the Lansdowne HOA, he had a conflict of interest. Although he was the President and a Director of the Lansdowne HOA Board of Directors, Mitchel was also the Director and President of LCD—which, through its wholly-owned subsidiary, had a financial interest in the transaction between the Lansdowne HOA and OpenBand at Lansdowne.

56. Beginning in or around May 2002, and continuing to the present, the Lansdowne HOA has paid OpenBand at Lansdowne in excess of $26 million in monthly fees. The Lansdowne HOA residents have further paid millions of dollars more for premium services, such as voicemail, call waiting, and premium channels like HBO, which are billed by OpenBand at Lansdowne directly to the residents. LCD has received and continues to receive a percentage of this money.

57. Based on information and belief, to date, LCD (through LCD Communications) has received from the Lansdowne HOA, as its share of the fees, approximately $2 million in guaranteed payments from OpenBand at Lansdowne. It has also received millions of dollars in premium-service fees paid directly by residents.

58.     The Telecommunications Services Agreement was and is unfair to the Lansdowne HOA and its residents, and has adversely affected their interests.  Moreover, it never was and never has been approved or ratified by a majority of disinterested members of the Lansdowne HOA Board of Directors or homeowners.

**2.      In a Brazen Case of Self-Dealing, the Defendants Cause the Lansdowne HOA to Enter Various Exclusive Access Agreements.**

59.     On the same day that the Defendants caused the execution of the Telecommunications Services Agreement between the Lansdowne HOA and OpenBand, they caused the Lansdowne HOA to enter further agreements designed, in combination with the Telecommunications Services Agreement, to ensure that residents would be required to purchase communications services from OpenBand at Lansdowne and would be unable to purchase wireline communications services from any other entity.

60.     By an agreement titled "Exclusive Easement for Telecommunications Services at Lansdowne on the Potomac" dated May 14, 2001,  the Defendants caused Lansdowne HOA to agree that Defendant LCD Communications would have the exclusive right to provide communication services to the Lansdowne development.  This agreement was effectuated by the purported grant of an exclusive easement over the entire Lansdowne at the Potomac development.  A copy of the "LCD-LCD Communications Agreement" is attached hereto and incorporated by reference.  *See* Exhibit 2.

61.     The LCD-LCD Communications Agreement was made by and between LCD, as owner and grantor, LCD Communications, as grantee, and the Lansdowne HOA, as future owner.  Hobie Mitchel signed the agreement on behalf of all three parties—LCD, LCD Communications, and the Lansdowne HOA.

62.     At the time Mitchel executed the agreement on behalf of the Lansdowne HOA, he served as the President and a Director of the Lansdowne HOA.  In addition, he was the President of LCD and LCD Communications, both of which had a financial interest in the transaction that was adverse to the interests of the Lansdowne HOA.

63.     In entering the agreement, LCD intended to grant LCD Communications "the right to be the exclusive provider of telecommunication services to the Lansdowne development."

64.     The LCD-LCD Communications Agreement was and is unfair to the Lansdowne HOA and its residents, and has adversely affected their interests.  Moreover, it never was and never has been approved or ratified by a majority of disinterested members of the Lansdowne HOA Board of Directors or homeowners.

65.     Because communications services were to be provided pursuant to the Telecommunications Services Agreement between the Lansdowne HOA and OpenBand at Lansdowne, the LCD-LCD Communications Agreement provided that the "exclusive easement" over the entire development could be transferred by LCD Communications without the consent of LCD.

66.     On May 14, 2001, the very same day LCD and LCD Communications entered their exclusive agreement, LCD Communications entered an identical agreement, also titled "Exclusive Easement for Telecommunication Service at Lansdowne on the Potomac," with OpenBand at Lansdowne.  A copy of the "LCD Communications-OpenBand at Lansdowne Agreement" is attached hereto and incorporated by reference.  *See* Exhibit 3.

67.     The agreement was made by and between LCD Communications, as grantor, OpenBand at Lansdowne, as grantee, and the Lansdowne HOA, as future owner.  Hobie Mitchel

signed the agreement on behalf of LCD Communications and the Lansdowne HOA.  William Dean signed the agreement on behalf of OpenBand at Lansdowne.

68.     At the time Mitchel executed the LCD Communications-OpenBand at Lansdowne Agreement on behalf of the Lansdowne HOA, he served as the President and a Director of the Lansdowne HOA.  In addition, he was the President of LCD and LCD Communications, both of which had a financial interest in the transaction that was adverse to the interests of the Lansdowne HOA.

69.     The agreement grants OpenBand at Lansdowne the exclusive and perpetual right to construct, operate, and maintain underground and above-ground telecommunications lines and cables, including telephone, Internet, and video facilities.  The agreement also grants OpenBand the exclusive right to install and maintain connection lines to individual homes.

70.     The agreement also provides that no other person or entity shall be entitled to construct, operate, or maintain any underground or above ground telecommunications lines or cables on, under, or across any of the Lansdowne development without the consent of OpenBand at Lansdowne.

71.     It further provides that the Lansdowne HOA agrees that for the duration of the agreement, it shall not grant any easement for the purpose of constructing, operating, or maintaining underground and above ground telecommunications lines and cables, including telephone, Internet, and television facilities, or house-connection lines.

72.     In addition, the LCD Communications-OpenBand at Lansdowne Agreement contemplates that these blanket restriction preventing any other provider from installing or operating telecommunications facilities within the Lansdowne development, which the Defendants labeled an easement, would eventually be replaced by actual easements of a specific

17

width and length. Notwithstanding, the blanket restriction preventing another communications provider access to Lansdowne on the Potomac was preserved.

73.    Indeed, the LCD Communications-OpenBand at Lansdowne Agreement specifies that the contemplated change from a blanket restriction over the entire Lansdowne development to defined easements shall in no way be deemed to change, reduce or modify the intent of the LCD Communications to grant OpenBand at Lansdowne an exclusive and perpetual right to provide communications services to the residents of the development.

74.    Beginning in or around August 2002, and continuing to at least April 2006, the Defendants executed numerous agreements titled "Modification of Blanket Easement," in order to specifically identify the areas in which communication facilities are located. These "modifications," like the original blanket restrictions, restate the Defendants' agreement that OpenBand at Lansdowne "has the right to exclusively provide telecommunications services on the entire property." These further state that notwithstanding the identification of specific areas in which OpenBand at Lansdowne's facilities will be located, OpenBand at Lansdowne has the right to be the "sole exclusive person or entity" to provide communication services to the Lansdowne development. These "modifications" were signed by Hobie Mitchel on behalf of LCD and the Lansdowne HOA, and William Dean on behalf of OpenBand at Lansdowne. Copies of two "modifications" are attached hereto and incorporated by reference. *See* Exhibits 4 & 5.

75.    The LCD Communications-OpenBand at Lansdowne Agreement and the modifications thereto, were and are unfair to the Lansdowne HOA and its residents, and have adversely affected their interests. Moreover, they were not and have not subsequently been

approved or ratified by a majority of disinterested members of the Lansdowne HOA Board of Directors or homeowners.

76.     At the time Hobie Mitchel executed the LCD-LCD Communications Agreement, the LCD Communications-OpenBand at Lansdowne Agreement (and the modifications thereto) on behalf of the Lansdowne HOA, and thereby prevented it from granting a competitive communications provider access to the Lansdowne community, he had a conflict of interest and a financial interest in OpenBand at Lansdowne, through LCD and LCD Communications, which would benefit and have benefited financially from OpenBand at Lansdowne's exclusive right to provide to the Lansdowne community communication services.

77.     The Defendants have profited and continue to profit from the Lansdowne HOA's inability to grant any other communications services provider access to the Lansdowne development, and the Lansdowne HOA and its residents have and continue to be injured by the absence of an alternate provider and inability to contract for alternate services.

78.     LCD also agreed to grant to OpenBand Multimedia and OpenBand of Virginia an easement within a designated area of the Lansdowne development. The easement granted these entities the right to construct and operate the infrastructure necessary for the provision of telephone, video, and Internet services.

79.     Importantly for purposes of effectuating the Defendants' conspiracy, the agreement did not grant OpenBand Multimedia or OpenBand of Virginia the right to run their telecommunication facilities to the residents' homes. The right to construct and operate house-connection lines was given exclusively to LCD Communications, which in turn granted that exclusive right to OpenBand at Lansdowne.

80.     The Defendants by design did not grant an easement to run house-connection lines to OpenBand of Virginia by design. OpenBand of Virginia is a local exchange carrier (telephone company), and as such, it is a "utility" subject to federal law which mandates that a utility that uses its rights-of-way for wire communications must provide a cable television system or any telecommunications carrier with nondiscriminatory access to any right-of-way owned or controlled by it.

81.     The Defendants understood that if OpenBand of Virginia held a right-of-way to construct and operate house-connection lines, residents of the Lansdowne development would have been able to obtain communication services from another provider. Accordingly, to ensure the success of their conspiracy and monopoly, and to circumvent federal law, the Defendants granted the right to run house-connection lines only to OpenBand at Lansdowne.

82.     On July 24, 2001, OpenBand at Lansdowne entered into a services agreement with OpenBand of Virginia and OpenBand Multimedia for the delivery of telecommunication services to the Lansdowne development.

83.     Under the services agreement, OpenBand of Virginia is obligated to provide telephone services, and OpenBand Multimedia is obligated to provide video and Internet services.

84.     During the construction and development of Lansdowne on the Potomac, a competitive telecommunications provider, Adelphia Cable Communications, whose cable system in Loudoun County was subsequently purchased by Comcast, attempted to lay and operate its service lines in the development.

85.     In furtherance of their conspiracy, the Defendants refused to permit Adelphia Cable Communications to lay its service lines. In fact, LCD threatened that any attempt to gain

access to utility trenches could result in LCD summoning local law enforcement and initiating

trespassing charges against Adelphia's employees or contractors.

**3.    In a Brazen Case of Self-Dealing, the Defendants Cause the Amendment of the Covenants, Conditions and Restrictions to Grant OpenBand at Lansdowne the Exclusive Right to Provide Communications Services to the Development.**

86.     In addition to causing the execution of the Telecommunications Service

Agreement and the exclusive access agreements, the Defendants further effectuated their

conspiracy by amending the covenants, conditions, and restrictions of Lansdowne on the

Potomac.  On June 18, 2001, LCD recorded the First Amended and Restated Declaration of

Covenants, Conditions and Restrictions for Lansdowne on the Potomac ("First Amended

CC&R"), which was signed by Hobie Mitchel.  A copy of the First Amended CC&R is attached

hereto and incorporated by reference. *See* Exhibit 6.

87.     The First Amended CC&R includes provisions granting the Defendants the

exclusive and perpetual right to provide communication services to the development.  The First

Amended CC&R prevents the Lansdowne HOA from granting another communications service

provider access to the Lansdowne community, which in turn has prevented and hindered the

Lansdowne HOA and its residents from obtaining communication services from another

provider.

88.     The First Amended CC&R provides that the Defendants shall have the right to

install and provide an exclusive private utility system and provide services, including telephone,

cable, and telecommunications services, to the development.  It further provides that the

Defendants' rights in the private utility system and the services provided through the system are

exclusive, and no other entity may provide communication services to the Lansdowne

development.

89.     The First Amended CC&R also provides that the access rights of the development's "Telecommunications Provider" are "exclusive" and "shall survive in perpetuity."

90.     The First Amended CC&R is incorporated by reference into the Telecommunications Services Agreement. In particular, the article titled "Covenants, Representations and Warranties" states that the Lansdowne HOA covenants that the First Amended CC&R is a "binding obligation of the HOA and enforceable against the HOA." In addition, the Telecommunications Services Agreement provides that the Lansdowne HOA cannot amend the First Amended CC&R in any way that "would (i) result in a termination of this Agreement or allow the HOA to terminate this agreement or (ii) have a materially adverse effect on [OpenBand at Lansdowne]."

91.     The Telecommunications Services Agreement, the exclusive access agreements, and the First Amended CC&R were and are an integral part of the Defendants' conspiracy to monopolize and restrain competition for communication services, and injure the Plaintiff and its homeowners.

### 4.     In a Brazen Case of Self-Dealing, The Defendants Misused Their Positions as Members of the Lansdowne HOA's Board of Directors and Caused the HOA to Approve the Telecommunications Services Agreement.

92.     Once LCD and M.C. Dean had put into place the agreements necessary to effectuate their agreement and conspiracy, LCD sought to have the Telecommunications Services Agreement approved by the Lansdowne HOA.

93.     On June 14, 2002, the Lansdowne HOA Board of Directors met at the Lansdowne Information Center to approve the Telecommunications Services Agreement. The Board of Directors included Hobie Mitchel, Robert Davis, and Laurie Schultz. Mitchel served as the President, Davis as the Vice President, and Schultz as the Secretary/Treasurer.

94.     By the motions of Schultz and Davis, the Board of Directors unanimously
approved the Telecommunications Services Agreement by a vote of 3-0.

95.     At the time Mitchel, Davis, and Schultz served as members and officers of the
Lansdowne HOA Board of Directors and approved the Telecommunications Services
Agreement, each of them had a conflict of interest.

96.     Mitchel was the President of the developer, LCD, and Schultz was employed by
LCD as its marketing director. Davis was the President of the D.C. Metro Division of Centex, a
real estate developer that owned an interest in LCD.

97.     As such, Mitchel, Davis, and Schultz had a financial, professional, and
employment relationship with LCD, which had a financial interest in the Telecommunications
Services Agreement. These relationships with LCD adversely affected the objectivity of the
directors when approving the Telecommunications Services Agreement.

98.     At the time the Telecommunications Services Agreement was approved, LCD
was the developer of the Lansdowne community, a principal of one of the contracting parties,
OpenBand at Lansdowne (through its ownership of LCD Communications), and in control of the
other contracting party, the Lansdowne HOA.

99.     LCD, through the ownership interests of its wholly-owned subsidiary, LCD
Communications, receives a percentage of the revenue that OpenBand at Lansdowne receives
from the provision of communication services to the Lansdowne on the Potomac development.

100.    The Telecommunications Services Agreement, the First Amended CC&R, the
LCD-LCD Communications Agreement, and the LCD Communications-OpenBand at
Lansdowne Agreement grant OpenBand at Lansdowne the exclusive right to provide
communication services to the residents of the Lansdowne development. This exclusive right is

accomplished by the Lansdowne HOA's inability to grant another provider access to any property within the Lansdowne development. This disability is the product of LCD's and its agents' self-dealing.

101.    The Defendants intended to conceal and did conceal their unlawful conspiracy by falsely and fraudulently representing in the Telecommunications Services Agreement and to individual homeowners that homeowners could acquire services from any alternate provider. These representations were further intended to conceal from subsequent homeowner-controlled Boards the true nature and character of the scheme implemented by the Defendants.

102.    As a direct consequence of the Defendants' conspiracy to prevent, restrain, and eliminate competition for communications services within the Lansdowne development, the Lansdowne HOA, and in turn the residents of Lansdowne on the Potomac, have been charged and have paid rates for services that are more than what they would pay for those same services in an open and competitive market.

103.    The exclusivity agreements between LCD, LCD Communications, and OpenBand at Lansdowne, the First Amended CC&R, and the Telecommunications Services Agreement were and are critical to the implementation of Defendants' unlawful conspiracy and are inextricably linked thereto, and operate to exclude or restrict other communication providers from entering the markets to provide wireline telephone, high-speed Internet, paid television, and bundled packages for these services in the Lansdowne community.

## III.   THE TELECOMMUNICATIONS SERVICES AGREEMENT

104.    Under the Telecommunications Services Agreement, OpenBand at Lansdowne— via OpenBand Multimedia and OpenBand of Virginia—provides two types of services, Platform Services and Premium Services.

24

105.    Platform Services are basic telephone, high-speed Internet, and video services for which the residents of the Lansdowne development are required to pay as a part of their homeowners association dues, and are defined in the Telecommunications Services Agreement. Basic telephone service includes one telephone number, unlimited local calling, and access to long-distance carriers, operator services, and directory services.  Basic Internet service includes 100BaseFX Ethernet connection to the home.  Basic video (television) service includes analog and digital video delivered programming that includes a minimum of one-hundred twenty (120) channels.

106.    The Lansdowne HOA is billed directly for Platform Services by OpenBand at Lansdowne.  All residents of the Lansdowne development are charged for Platform Services, whether or not they use them.

107.    Premium Services are telephone, Internet, and video services that are made available to residents on an elective basis, and are billed directly to residents.  Premium telephone services include voicemail, call waiting, caller ID, and three-way calling.  Premium video services include premium channels (*e.g.*, HBO, Showtime) and pay per view channels.

108.    The Telecommunications Services Agreement contains the monthly prices for Platform Services for the first year of the Agreement.  After this initial period, however, the Telecommunications Services Agreement does not contain a definitive price term.

109.    Rather, the price for Platform Services is determined annually by OpenBand at Lansdowne. The price for Platform Services is ostensibly based upon the price charged by "comparable providers" with similar service and performance abilities, providers which are selected solely at the discretion of OpenBand at Lansdowne.

110.    This pricing scheme purposely allows OpenBand at Lansdowne to charge supra-competitive prices.  Typically, providers of telephone, video, and Internet service offer their most competitive pricing through pricing promotions that last for a limited time.  At the end of the promotional period, consumers may negotiate new promotional pricing or switch to another provider.  Thus, to determine the price of these services in a competitive market, it is necessary to focus on promotional pricing.  The Telecommunications Services Agreement, however, excludes short-term and promotional pricing in calculating OpenBand at Lansdowne's price for telephone and video service.  Instead, OpenBand at Lansdowne's price is capped at ninety percent of the non-promotional price offered for comparable service by a "comparable provider" of its choice.  And although the agreement does not exclude short-term or promotional pricing for Internet, OpenBand at Lansdowne has excluded these lower prices in calculating its Internet price and the Internet price charged to the Lansdowne HOA

111.    The Telecommunications Service Agreement has an initial term of twenty-five (25) years, and OpenBand at Lansdowne has the unilateral right to extend the contract for an additional forty (40) years.

112.    OpenBand at Lansdowne represented in the Telecommunications Services Agreement and other agreements that throughout the term of the OpenBand at Lansdowne contract, homeowners had the option to obtain any services, including Platform and Premium Services, from "any and all" providers other than OpenBand at Lansdowne.

113.    This statement and representation was and is false, and the Defendants knew at the time it was false.

114.    OpenBand at Lansdowne held an exclusive right to provide communication services that prevented and continues to prevent and otherwise hinder any other provider from

installing or operating competing Platform or Premium communication services within the Lansdowne development.

115.    This representation was fraudulently made by the Defendants with the intent to deceive and conceal the Defendants' unlawful conspiracy from the Lansdowne HOA and its residents.

116.    The material terms of the Telecommunications Services Agreement were not fully disclosed to the residents of the Lansdowne development at the time of their home purchase.

117.    Moreover, each homeowner, concurrently with the "closing" on their house, was required to enter into a three-way Communications Services Agreement between themselves, the Lansdowne HOA, and several of the Defendants.  Homeowners who failed to enter the three-way agreement stood to lose their deposit and home, and faced the prospect of legal action by the builder for breach of contract due to the homeowner's failure to close on their home purchase.  A copy of the three-way Communications Services Agreement is attached hereto and incorporated by reference. *See* Exhibit 7.

118.    The Telecommunications Services Agreement, executed by Mitchel on May 14, 2001, and approved by the Lansdowne HOA via the unanimous vote of three interested directors, is unconscionable and unfair.  Over the course of the contract, OpenBand at Lansdowne has utilized many of the unconscionable terms in determining price and services to be provided.  The Lansdowne HOA has attempted to renegotiate the unconscionable terms with OpenBand at Lansdowne, but it has refused to do so.

119.    The Telecommunications Service Agreement specifies that the initial term of the Agreement is twenty-five (25) years.  Following the initial term, OpenBand at Lansdowne has the exclusive and unilateral option to renew the Agreement for four successive ten (10) year

27

periods. If OpenBand at Lansdowne exercised each of its options, the Agreement could be extended for sixty-five (65) years.

120. The Telecommunications Services Agreement vests OpenBand at Lansdowne with the exclusive right to designate, at its election, new Comparable Providers to be used in calculating the price OpenBand at Lansdowne charges the Lansdowne HOA for Platform Services. OpenBand at Lansdowne, therefore, is contractually permitted to charge as much as possible by selecting a Comparable Provider with the highest rates.

121. Similarly, for telephone and video service, the Telecommunications Services Agreement allows OpenBand at Lansdowne to exclude Comparable Providers' short-term and promotional pricing for the purpose of calculating OpenBand at Lansdowne's monthly fees.

122. The Telecommunications Services Agreement allows OpenBand at Lansdowne to determine what level and quality of service it will provide by permitting it to select the Comparable Providers against which the quality of its service is judged.

123. The Telecommunications Services Agreement obligates each homeowner to pay for OpenBand at Lansdowne's Platform Services whether or not a homeowner uses any of those services.

124. The Telecommunications Services Agreement purports to allow OpenBand at Lansdowne to unilaterally add services. The Agreement defines Internet, telephone, and video services to include "evolved services," but does not specify what those services are. Instead, OpenBand at Lansdowne is only required to advise the Lansdowne HOA of the natural technological progress of evolution of Internet, telephone, and video services for the purpose of including and charging the Lansdowne HOA for those additional and new services.

28

125.    The Telecommunications Services Agreement allows OpenBand at Lansdowne to unilaterally and fundamentally alter the Agreement.  The Agreement provides that if OpenBand at Lansdowne is required to obtain a full franchise, OpenBand at Lansdowne can elect to discontinue providing to the Lansdowne HOA and its members video services, *i.e.*, television.  If OpenBand at Lansdowne elects to discontinue video services, the Agreement provides no remedy for the Lansdowne HOA or its members; and in fact, it obligates the Lansdowne HOA to revise the Agreement so that OpenBand at Lansdowne will not be required to provide video services.  This is true even though no other wireline video provider would be able to service the development.

126.    The Telecommunications Services Agreement releases OpenBand at Lansdowne of any and all liability for any consequential and special damages arising out of or related to the Agreement.  In addition, it excuses OpenBand at Lansdowne of any liability for the failure of performance by an entity providing prerequisite services related to the provision of services to the development.  Because OpenBand at Lansdowne does not provide any of the services, but instead contracted with OpenBand of Virginia and OpenBand Multimedia to provide the prerequisite services, OpenBand at Lansdowne can escape liability even in the case of a complete loss of services.

127.    In addition to being unconscionable, the Telecommunications Services Agreement does not adequately or sufficiently define the material terms of price and the service to be provided.  These terms are expressed in language that is inexact, indefinite, and obscure; thereby empowering OpenBand at Lansdowne to unilaterally define these material and essential terms of the Telecommunications Services Agreement.

128.    The monthly price for Platform Services is subject to change based on the unilateral decisions of OpenBand at Lansdowne. The Agreement provides that the price for video, Internet, and telephone services shall not exceed ninety percent of the rate charged for those services by comparable providers. OpenBand at Lansdowne, however, decides who is a comparable provider and what services it will use as a basis for comparison.

129.    OpenBand at Lansdowne has admitted to the Lansdowne HOA that a "true apples-to-apples comparison is not practical given the variance in service levels." Indeed, OpenBand at Lansdowne prices its video offerings against the video offerings of other providers that far exceed OpenBand at Lansdowne's offering in terms of quantity and quality.

130.    For instance, in October 2009, OpenBand at Lansdowne selected Verizon and its "FIOS TV Essentials" as one of the comparable providers and services for purposes of determining its 2010 rates. The cost of the Verizon video service was $53.98, which included 393 channels and 106 high-definition channels. By contrast, OpenBand at Lansdowne, through its service agreement with OpenBand Multimedia, provides far fewer channels.

131.    OpenBand at Lansdowne's selection of the pricing of other providers is arbitrary. OpenBand at Lansdowne's annual pricing, therefore, is left solely within its discretion.

132.    The services to be provided by OpenBand are also not adequately or definitively defined. The Agreement provides an initial definition of "Platform Services." However, the definitions of "Telephone Services," "Internet Services," and "Video Services," which comprise the Platform Services, also includes "evolved services." Evolved services are undefined and can include whatever OpenBand decides to include.

## INTERSTATE COMMERCE

133.    The Sherman Act violations alleged in this Complaint are within the flow of Interstate Commerce because the Defendants sell services that are by their very nature interstate transactions. In particular, the Defendants sell telephone service that allows customers to make interstate telephone calls; they sell Internet service that allows customers to make out-of-state Internet connections; and they sell video service that distributes programming produced and transmitted from out of state. The Defendants' illegal conduct has allowed them to monopolize or otherwise restrain trade in selling these services.

134.    The Sherman Act violations alleged in this Complaint have had and continue to have a substantial effect on interstate commerce.

135.    In order to provide service in the markets the Defendants have monopolized (or in which they have otherwise violated the Sherman Act), the Defendants purchase and sell services from interstate markets. For example, on information and belief, the Defendants purchase video programming produced in other states and receive that programming from satellites located outside the state of Virginia. The Defendants also interconnect to the public switched telephone network and the public Internet and, on information and belief, as part of this interconnectivity they receive access charges from out-of-state interexchange carriers.

136.    In addition, the Defendants' service allows customers to place interstate phone calls and make interstate connections over the Internet for the purpose of engaging in Interstate Commerce.

## RELEVANT PRODUCT MARKETS

137.    The sale of wireline telephone service to consumers is a relevant product market.

138.    The sale of wireline telephone service is distinct from the market for wireless

service because large numbers of consumers do not find wireless telephone service to be an

adequate substitute for wireline service.  Among other things, on information and belief,

consumers may perceive that wireline phone service provides clearer quality, fewer dropped

calls, and more reliable access to services such as 9-1-1 than wireless telephone service.  For this

reason, a monopolist over wireline telephone service to consumers would have the power to

impose a small but significant nontransitory increase in price over the competitive price.

139.    The sale of pay-television service to consumers is a relevant product market and

includes services like cable television, open video systems ("OVS"), and satellite-television

service.  However, on information and belief, satellite-television service is not available to all

residents of Lansdowne on the Potomac because the orientation of their homes or other

obstructions interfere with the satellite signal.

140.    The sale of high-speed wireline Internet access to consumers is a relevant product

market.

141.    The market for high-speed wireline Internet access is distinct from the market for

dial-up Internet service, satellite Internet service, and other forms of wireless Internet service

because a significant number of consumers do not find these products to be adequate substitutes

for high-speed wireline Internet access.  Among other things, on information and belief, these

consumers may find that these services are either too slow or too expensive.

142.    The market for bundled wireline-telephone, high-speed Internet, and pay-

television services is a relevant market.  This market is distinct from the market for these

services individually because providers generally provide deep discounts to consumers who wish

to purchase all three of these products, and consumers who purchase all three services therefore find it uneconomical to purchase them separately.

## RELEVANT GEOGRAPHICAL MARKET

143.    The relevant geographical market for the purchase of wireline telephone, pay television, wireline high-speed Internet service, and bundled packages of these services is the Lansdowne on the Potomac development.  This is because a consumer's ability to purchase these services depends on which carriers provide service to the consumer's individual home, and, on information and belief, carriers typically choose to wire the entire development or not provide service at all.

144.    The relevant geographical market does not include areas near the Lansdowne on the Potomac development because residents do not typically buy real estate or choose to move simply in order to purchase communications services from a competing provider.

## COUNT ONE

### (Contract, Combination, or Conspiracy in Restraint of Trade)
### (15 U.S.C. § 1, Va. Code § 59.1-9.5)

145.    Paragraphs 1 through 144 are incorporated herein by reference.

146.    Beginning in our about 2000 and continuing through the present, the Defendants have agreed, combined, and conspired to unreasonably restrain interstate trade in the markets for wireline-telephone, paid-television, high-speed broadband Internet services, and bundled packages for these services, in the Lansdowne on the Potomac development.

147.    In particular, as evidenced by (among other things) the exclusivity agreements between LCD, LCD Communications, and OpenBand at Lansdowne, and the Telecommunications Services Agreement, the Defendants have sought unlawfully to prevent or otherwise hinder the Lansdowne HOA and the residents of the Lansdowne on the Potomac

33

development from purchasing services of a comparable quality at a competitive rate from competitors. Furthermore, the Defendants have unlawfully prevented or otherwise hindered competitors from offering services of a comparable price and quality to the Lansdowne HOA and the residents of Lansdowne on the Potomac.

148. The Plaintiff and its homeowner members have suffered injuries actionable under the Antitrust laws and which will be proven at trial, including but not limited to the following:

   a.   As a result of the illegal conspiracy, the Plaintiff and its homeowner members pay higher prices for wireline telephone service, paid television service, high-speed Internet service, and the bundled package of these services, than they would absent the conspiracy.

   b.   As a result of the illegal conspiracy, the Plaintiff and its homeowner members are unable to enter contracts with telephone, cable, and Internet providers of their choice.

   c.   As a result of the illegal conspiracy, the Plaintiff and its homeowner members receive lower quality service than they would in a competitive market.

### COUNT TWO

**(Conspiracy to Monopolize)**
**(15 U.S.C. § 2, Va. Code § 59.1-9.6)**

149. Paragraphs 1 through 148 are incorporated herein by reference.

150. Beginning at least as early as 2000 and continuing to the present, the Defendants have conspired and agreed among themselves to establish and maintain an unlawful monopoly in the market for the provision of wireline-telephone, paid-television, high-speed Internet services, and the bundled package of these services, to the Plaintiff and the residents of Lansdowne on the Potomac.

151.    During all relevant times, the Defendants knew that their unlawful conduct would result in the likely acquisition of a monopoly and specifically intended to achieve that result. Moreover, the Defendants knew that their likely acquisition of a monopoly would prevent the Lansdowne HOA and its homeowner members from obtaining comparable wireline-telephone, paid-television, high-speed Internet, and bundled packages of these services at a competitive price from an alternate provider.

152.    The Defendants have committed numerous acts in furtherance of the conspiracy as alleged throughout this Complaint, including but not limited to:

a.      The Defendants, through an unlawful course of self-dealing, unlawfully caused the Plaintiff to enter various agreements specifying that OpenBand at Lansdowne would be the Plaintiff's and its residents' exclusive provider of communication services.

b.      The Defendants created or caused the creation of and maintained or caused to be maintained agreements providing OpenBand at Lansdowne with the exclusive right to construct, maintain, and operate communication facilities within the Lansdowne development; and

c.      The Defendants refused to grant Adelphia Cable Communications access to the Lansdowne development.

d.      The Defendants falsely represented to the Lansdowne HOA and its residents that they would be able to subscribe to telephone, video, and Internet providers of their choice.

153.    The Plaintiff and the residents of the Lansdowne development have suffered injuries actionable under the Antitrust laws and which will be proven at trial, including but not limited to the following:

a.      As a result of the illegal conspiracy, the Plaintiff and its homeowner members pay higher prices for wireline-telephone, paid-television, and high-speed Internet services, and bundled packages of these services than they would absent the conspiracy.

b.      As a result of the illegal conspiracy, the Plaintiff and its homeowner members are prevented or otherwise hindered from entering contracts with communications providers of their choice.

c.      As a result of the illegal conspiracy, the Plaintiff and its homeowner members receive lower quality service than they would absent the conspiracy.

## COUNT THREE

### (Monopolization)
### (15 U.S.C. § 2, Va. Code § 59.1-9.6)

154.    Paragraphs 1 through 153 are incorporated herein by reference.

155.    Defendant OpenBand at Lansdowne, and the other Defendants through it, possess monopoly power over the markets for wireline-telephone, paid-television, high-speed Internet, and bundled packages of these services in Lansdowne on the Potomac.

156.    Beginning at least as early as 2000 and continuing to the present, the Defendants have willfully acquired, maintained, and abused this monopoly power in the relevant markets through the use of exclusive agreements that prevent competitors from offering service to residents of Lansdowne on the Potomac.

157.    The Plaintiff and its resident members have suffered injuries actionable under the Antitrust laws and which will be proven at trial, including but not limited to the following:

a.      As a result of the illegal conspiracy, the Plaintiff and its homeowner members pay higher prices for wireline-telephone, paid-television, high-speed Internet services, and bundled services than they would absent the conspiracy.

b.      As a result of the illegal conspiracy, the Plaintiff and its homeowner members are prevented or otherwise hindered in their ability to enter contracts with communications providers of their choice.

c.      As a result of the illegal conspiracy, the Plaintiff and its homeowner members receive lower quality service than they would in a competitive market.

## COUNT FOUR

### (Attempted Monopolization)
### (15 U.S.C. § 2, Va. Code § 59.1-9.6)

158.   Paragraphs 1 through 157 are incorporated herein by reference.

159.   If this Court determines that the Defendants have not succeeded in monopolization, the Defendants have used methods, means, and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approached so close as to create a dangerous probability of monopolization.

160.   During all relevant times, the Defendants specifically intended to monopolize the markets for wireline-telephone, paid-television, high-speed Internet, and bundled packages of these services within Lansdowne on the Potomac.

161.   The Defendants have committed numerous acts in furtherance of their attempt to monopolize as alleged throughout this Complaint, including but not limited to:

a.      The Defendants, through an unlawful course of self-dealing, unlawfully caused the Plaintiff to enter various agreements granting OpenBand at Lansdowne the

exclusive right to provide communication services to the Plaintiff, its homeowner residents, and the Lansdowne development.

    b.    The Defendants refused to grant Adelphia Cable Communications access to the Lansdowne on the Potomac development.

    c.    The Defendants falsely represented in the Telecommunications Services Agreement and to residents and prospective residents of Lansdowne on the Potomac that they would be able to subscribe to wireline-telephone, cable-television, and high-speed-Internet-service providers of their choice.

    d.    The Defendants caused the Plaintiff to enter and approve the Telecommunications Services Agreement and other agreements described herein.

162.    The Defendant's attempted monopolization involved a dangerous probability of success in that their plan would, if successful, prevent competitors from offering wireline telephone, paid television, high-speed Internet, and bundled packages of these services, to residents of Lansdowne on the Potomac and make it highly unlikely that residents would purchase these or similar services from alternate providers.

163.    The Plaintiff and its resident members have suffered injuries actionable under the Antitrust laws and which will be proven at trial, including but not limited to the following:

    a.    As a result of the illegal conspiracy, the Plaintiff and its homeowner members pay higher prices for wireline telephone service, paid television service, high-speed Internet, and bundled services than they would absent the conspiracy.

    b.    As a result of the illegal conspiracy, the Plaintiff and its homeowner members are unable to enter contracts with telephone, cable, and Internet providers of their choice.

c.    As a result of the illegal conspiracy, the Plaintiff and its homeowner members receive lower quality service than they would in a competitive market.

## COUNT FIVE

### (Declaratory Judgment that Transactions Are Void for Self-dealing)
### (Va. Code § 13.1-691)

164.    Paragraphs 1 through 163 are incorporated herein by reference.

165.    The LCD-LCD Communications Agreement, the LCD Communications-OpenBand at Lansdowne Agreement, the First Amended CC&R, the Telecommunications Services Agreement, and the Communications Services Agreement were the product of self-dealing by LCD, acting through its officers, agents, and employees, Mitchel, Davis, and Schultz.

166.    Acting in their capacity as officers and directors of the Lansdowne HOA, Mitchel, Davis, and/or Schultz entered, executed, and/or approved the LCD-LCD Communications Agreement, the LCD Communications-OpenBand at Lansdowne Agreement, the First Amended CC&R, the Telecommunications Services Agreement, and the three-way Communications Services Agreement that grant OpenBand at Lansdowne and its affiliates the exclusive right to provide communication services to the Lansdowne community. At the time these agreements were entered and approved, LCD controlled the Lansdowne HOA.

167.    Mitchel, Davis, and Schultz had a conflict of interest by virtue of their financial, professional, employment, and other relationship with LCD, which through its ownership interest in OpenBand at Lansdowne, benefited financially from these agreements.

168.    The material facts of these transactions were not disclosed and the transactions were not authorized, approved, or ratified by a majority of disinterested directors or a majority of the Lansdowne HOA's members.

169.     Through the self-dealing of LCD, it gained an unjust and undeserved advantage by giving exclusive communications service rights to the Defendants.

170.     These transactions are unfair to the Lansdowne HOA and its resident members, and they have been damaged as a direct and proximate result of these transactions.

## COUNT SIX

### (Easements are Void as Unlawful and Against Public Policy)

171.     Paragraphs 1 through 170 are incorporated herein by reference

172.     The easements granted by LCD to LCD Communications and by LCD Communications to OpenBand at Lansdowne impose a blanket and perpetual restriction over the entire Lansdowne community development.

173.     This blanket restriction prevents all communication providers in perpetuity from installing and operating any communication facilities on, under, or through the Lansdowne development.

174.     This blanket restriction was the product of LCD's self-dealing and was imposed during the period when LCD exercised control of the Lansdowne HOA.

175.     LCD and OpenBand at Lansdowne concealed the perpetual and exclusive communications easements granted OpenBand at Lansdowne by fraudulently representing that residents of the Lansdowne community could obtain services from any and all providers other than OpenBand at Lansdowne.

176.     The easements granting LCD Communications and OpenBand at Lansdowne the exclusive right to provide communication services impose an unreasonable restraint on trade and create and maintain an unlawful monopoly over the provision of paid television, high-speed

Internet, wireline telephone services, and the bundled packages of these services, to the

Lansdowne HOA and its members.

177.    These easement are unlawful and against public policy; and are therefore invalid

and unenforceable.

## COUNT SEVEN

### (Declaratory Judgment that Contract Violates FCC Exclusivity Order)
### (47 U.S.C. § 548)

178.    Paragraphs 1 through 177 are incorporated herein by reference.

179.    The Defendants caused the Lansdowne HOA to enter and execute various

agreements that individually and in combination grant the Defendants the exclusive right to

provide communication services, including paid television, to the Lansdowne HOA and its

members, and prevent the Lansdowne HOA from engaging any other provider of telephone,

Internet, or video services.

180.    The Defendants caused the Lansdowne HOA to enter these exclusive agreements

through the use of sham corporations, self-dealing, fraud, and unfair and deceptive acts.

181.    The Defendants improper actions included, *inter alia*, amending the Lansdowne

on the Potomac's covenants, conditions, and restrictions in order to grant the Defendants' the

exclusive right to provide communication services; establishing OpenBand at Lansdowne as a

sham corporation for the sole purpose of entering the Telecommunications Services Agreement

with the Lansdowne HOA and holding the exclusive right to provide communication services;

causing OpenBand Multimedia to deliver video services to the Lansdowne development pursuant

to an agreement between OpenBand at Lansdowne and OpenBand Multimedia; using LCD's

control over the Lansdowne HOA to enter and approve the Telecommunications Services

Agreement with OpenBand at Lansdowne; granting OpenBand at Lansdowne a perpetual and

exclusive right to provide communication services to the entire Lansdowne community; falsely representing that individual homeowners could purchase communication services from any and all other providers; and paying LCD a percentage of the revenue M.C. Dean and its affiliates received from the exclusive right to provide communication services.

182.     This exclusive arrangement is anticompetitive and has adversely affected the market for cable and video services by significantly impairing and restricting the ability of other communication providers to deliver services to the Lansdowne HOA and its members.

183.     Indeed, this exclusive agreement was used by the Defendants to prevent a cable operator from providing video services to the Lansdowne HOA and its members.

184.     OpenBand at Lansdowne, on behalf of itself and its affiliates, has refused to renegotiate its exclusive communications services agreement.

185.     The Lansdowne HOA and its resident members have been harmed and continue to be harmed by the continued enforcement, or threat of enforcement, of the exclusive agreements.

## COUNT EIGHT

### (Conspiracy to Injure Another in its Reputation, Trade, and Business)
### (Va. Code §§ 18.2-499, 500)

186.     Paragraphs 1 through 185 are incorporated herein by reference.

187.     The Defendants have combined, associated, agreed, and mutually undertaken together for the purpose of willfully and maliciously injuring the Lansdowne HOA in its reputation, trade, and business by causing it, through the self-dealing of LCD and its agents Mitchel, Davis, and Schultz, to enter various agreements that, together and in combination, grant the Defendants the exclusive and perpetual right to construct and operate telecommunication facilities on, under, and through the Lansdowne development, and provide communication services to the Lansdowne development.

188.    The Defendants' actions were intentional, purposeful, and without legal justification.  Moreover, these actions have injured the Lansdowne HOA by causing it to pay fees for communication services above what it would pay in a competitive market.

189.    In return for LCD's agreement to utilize its control over the Lansdowne HOA to effectuate the Defendants' agreement in restraint of trade and preserve their monopoly, LCD received and continues to receive a percentage of all revenue generated from the Lansdowne HOA and its members.

190.    The Defendants' actions have caused and resulted in substantial damages to the Lansdowne HOA in an amount to be proven at trial.

191.    The Lansdowne HOA has incurred and will continue to incur costs, including attorney fees, in taking action against the Defendants for their intentional and illegal actions.

## COUNT NINE

### (Common Law Civil Conspiracy)

192.    Paragraphs 1 through 191 are incorporated herein by reference.

193.    The Defendants have combined, associated, agreed, and mutually undertaken together, by and through their concerted action to restrain trade and maintain a monopoly over the provision of telecommunication services to the Lansdowne development.

194.    The Defendants actions were intentional and unlawful.

195.    The Defendants' actions have caused and resulted in substantial damages to the Lansdowne HOA in an amount to be proven at trial.

196.    The Lansdowne HOA has incurred and will continue to incur costs, including attorney fees, in taking action against the Defendants for their intentional and illegal actions.

## COUNT TEN

### (Declaratory Judgment that Contract is Void for Vagueness)

197.    Paragraphs 1 through 196 are incorporated herein by reference.

198.    The Telecommunications Services Agreement lacks the mutual assent of the Lansdowne HOA and OpenBand at Lansdowne to the essential and material terms of price and the nature and scope of the service to be performed.

199.    The contractual provisions related to these material terms are not expressed in a sufficiently exact and definite manner.

200.    Because the Telecommunications Services Agreement's terms related to price and the service to be provided are inexact and indefinite, the Agreement is unenforceable and void for vagueness.

## COUNT ELEVEN

### (Declaratory Judgment that Contract is Unconscionable)

201.    Paragraphs 1 through 200 are incorporated herein by reference.

202.    The Telecommunications Services Agreement, the exclusive access agreements, and the First Amended CC&R are unconscionable.

203.    These agreement were agreed to, entered, and approved by officers and directors of the Lansdowne HOA's Board of Directors who were appointed by and controlled by LCD, which owns an interest in OpenBand at Lansdowne (through its ownership of LCD Communications).  These agreement were not entered in good faith.

204.    The Defendants did not disclose the specifics of the financial arrangement between them or the fact that LCD would receive a percentage of all revenue paid by the

Lansdowne HOA to OpenBand at Lansdowne as a direct result of the scheme implemented through these agreements.

205.    The Defendants fraudulently represented that the residents of the Lansdowne development could obtain services from any and all providers other than OpenBand at Lansdowne. This statement was false because LCD had granted OpenBand at Lansdowne a perpetual and exclusive right to construct and operate communication facilities on, under, and through the Lansdowne development.

206.    The Telecommunication Services Agreement was not recorded on the land records in order to conceal the material terms from subsequent homeowner-controlled Boards and homeowners, despite a provision allowing LCD, through its control of the Lansdowne HOA, and OpenBand at Lansdowne to do so. Moreover, all the terms, conditions, and obligations of the Telecommunication Services Agreement were not disclosed to the Lansdowne HOA's members.

207.    The Telecommunication Services Agreement also contains unconscionable terms, including but not limited to, those listed in Paragraphs 119 through 126. These include the sixty-five (65) year term; the unilateral right of OpenBand at Lansdowne to renew or terminate the contract after the initial term; the ability of OpenBand at Lansdowne to determine price based on its unilateral selection of comparable providers and products; the ability of OpenBand to determine prices without regard to short-term and promotional pricing offered by other providers; the unilateral ability of OpenBand at Lansdowne to add or subtract services and alter the agreement, and the mandate that homeowners pay for services whether or not they use them.

208.    In addition, the exclusive access agreements and the First Amended CC&R contain unconscionable terms because they grant the Defendants the exclusive and perpetual right to provide communication services to the Lansdowne HOA and its members.

209.    The Telecommunications Services Agreement, the exclusive access agreements, and the First Amended CC&R were tainted by the Defendants' overreaching, including but not limited to self-dealing, and was entered without meaningful choice of the Plaintiff.

210.    These agreement, as a whole, are so grossly inequitable and patently unfair as to shock the conscience.

## REQUEST FOR RELIEF

**WHEREFORE**, with respect to Counts One through Eleven, Plaintiff respectfully request:

1.    That the Court award actual damages, special damages, and any and all other damages available to the Plaintiff, plus pre-judgment and post-judgment interest, in an amount to be proven at trial;

2.    That the Court treble the award of damages against the Defendants, as provided by 15 U.S.C. § 15 and §§ 18.2-500 and 59.1-9.12 of the Code of Virginia, 1950, as amended;

3.    That the Court award the Plaintiff all costs of this litigation, including but not limited to all attorney's fees, witness fees, expert fees, and other costs and fees incurred by them to the fullest extent available under law, including but not limited to 15 U.S.C. § 15 and §§ 18.2-500 and 59.1-9.12 of the Code of Virginia, 1950, as amended;

4.    That the Court hold the Defendants jointly and severally liable for any and all awards of damages;

5.      That the Court enter an order adjudging and declaring the LCD-LCD Communications Agreement, the LCD Communications-OpenBand at Lansdowne Agreement, the Telecommunications Services Agreement, the Communications Services Agreement, and the provisions of the First Amended CC&Rs related to the Defendants' exclusive right to provide communication services are void and unenforceable, and the Defendants are enjoined from enforcing these agreements; and

6.      That the Court award such other and further equitable and/or legal relief to Plaintiff as it deems appropriate, just, necessary, and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY**

August 16, 2011                     Respectfully Submitted,

**LANSDOWNE ON THE POTOMAC**
**HOMEOWNERS ASSOCIATION, INC.**

By: _____

Thomas G. Connolly (Va. Bar No. 29164)
   TConnolly@wiltshiregrannis.com
Steven A. Fredley (seeking admission *pro hac vice*)
   SFredley@wiltshiregrannis.com
Mark D. Davis (seeking admission *pro hac vice*)
   MDavis@wiltshiregrannis.com
Jacinda A. Lanum (Va. Bar No. 75104)
   JLanum@wiltshiregrannis.com

WILTSHIRE & GRANNIS LLP
1200 Eighteenth Street NW, Suite 1200
Washington, DC 20036
(202) 730-1300 (tel)
(202) 730-1301 (fax)

*Counsel for Plaintiff Lansdowne on the*
*Potomac Homeowners Association, Inc.*