UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LANSDOWNE ON THE POTOMAC          )
HOMEOWNERS ASSOCIATION, INC.,     )
                                  )
          Plaintiff,              )
                                  )
     v.                           )     No. 1:11-cv-872 (AJT/TCB)
                                  )
OPENBAND AT LANSDOWNE LLC,        )
*et al.*,                         )
                                  )
          Defendants.             )
_____   )

## MEMORANDUM OPINION

The plaintiff, the homeowners association for the residential community known as

Lansdowne on the Potomac, challenges certain agreements entered into on its behalf by the real

estate developers that initially developed the community and controlled the association.  Those

agreements grant a single cable company, defendant OpenBand at Lansdowne, exclusive access

to Lansdowne residents for the provision of wired video and other communication services.

Presently before the Court are defendants' motions to dismiss Plaintiff's eleven count Complaint

pursuant to Fed. R. Civ. P. 12(b)(6) [Doc. Nos. 19 and 21].  That Complaint alleges three

categories of claims:

(1) violations of federal and state antitrust laws based on unlawful agreements between

the developers and a telephone, cable, and internet service provider that have the effect of

requiring all residents to deal exclusively with that service provider. (Counts One through Four);

(2) violations of a 2007 Order of the Federal Communications Commission ("FCC"),

promulgated pursuant to the Communications Act of 1934, 47 U.S.C. § 151, *et seq.*, as amended,

(the "Act") that prohibits cable operators from enforcing exclusive dealing arrangements (the "2007 Exclusivity Order").[1] (Count Seven); and

(3) state law claims based on breaches of duty, contract, and other unlawful conduct on the part of the Lansdowne on the Potomac developers and the cable company defendants in connection with the creation and operation of the Lansdowne Homeowners Association while it was under the control of the developers. (Counts Five, Six, and Eight through Eleven).

For the reasons discussed below, the Court will grant defendants' motions as to Counts One through Four with respect to plaintiff's federal antitrust claims and deny the motions as to Count Seven with respect to the 2007 Exclusivity Order. Because the remaining state law claims present novel and complex issues of state law that would predominate over the single remaining federal claim to be adjudicated in this case, the Court will decline to exercise supplemental jurisdiction over those state law claims and they will be dismissed without prejudice.

## I. Standard of Review

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In that regard, the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995). For that reason, a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw

---

[1] *In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 20235 (2007).

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct.

at 1949; *see also Twombly*, 555 U.S. at 556. "A pleading that offers labels and conclusions or a

formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 129 S. Ct. at 1949

(internal quotations omitted); *see also Twombly*, 550 U.S. at 555. A complaint is also insufficient

if it relies upon "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at

1949 (internal citations omitted). The central purpose of the complaint is to provide the

defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," and

the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the

defendant to prepare a fair response. *Twombly*, 550 U.S. at 555 (internal quotations omitted).

The plaintiff alleges violations of the Sherman Act, 5 U.S.C. §§ 1-2, and violations of the

Act and specifically an order promulgated pursuant to 47 U.S.C. § 548(c), which the Court has

jurisdiction to enforce pursuant to 47 U.S.C. § 401(b). Because the plaintiff asserts federal causes

of action, this Court has original subject matter jurisdiction under 28 U.S.C. § 1331. The Court

may also exercise supplemental jurisdiction over the state law claims to the extent that they are

so related to the federal claims that they form part of the same case or controversy under Article

III of the United States Constitution. 28 U.S.C. §1367(a).

## II. Background and Facts[2]

### *The Parties.*

The plaintiff, Lansdowne on the Potomac Homeowners Association, Inc. ("plaintiff" or

"Lansdowne HOA") is a homeowners association formed in December 2000 under Virginia law

by defendant Lansdowne Community Development, LLC, ("LCD"), the developer of

---

[2] These facts are based on the allegations in the Complaint and are taken as true, together with
any reasonable inferences therefrom, for the purposes of the defendants' motions to dismiss.

Lansdowne on the Potomac. LCD created Lansdowne HOA for the purpose of exercising the

powers, duties and obligations associated with the Lansdowne on the Potomac residential

community, located in Loudoun County, Virginia ("Lansdowne on the Potomac"). The

community consists of approximately 850 acres, on which 2,155 single family attached and

detached homes have been constructed. The residents of Lansdowne on the Potomac own their

homes, but all residents share an interest in common spaces that require central management.

The defendants are seven separate, but mostly related, entities that have been involved in

the development of Lansdowne on the Potomac. The parties fall into three categories: (1) the

Developer Defendants, consisting of Defendant LCD, and its wholly owned subsidiary,

Defendant LCD Communications LLC ("LCD Communications");[3] (2) the OpenBand

Defendants, consisting of Defendant M.C. Dean ("M.C. Dean") and its three wholly owned

subsidiaries, Defendant OpenBand SPE, LLC ("SPE"), Defendant OpenBand Multimedia, LLC

(OPM"), and Defendant OpenBand of Virginia LLC ("OPV");[4] and (3) OpenBand at Lansdowne

LLC ("OpenBand"), which is an entity that is jointly owned by LCD Communications and SPE.[5]

---

[3] LCD is a Virginia limited liability company formed in 1999 by a group of real estate
developers and builders for the purpose of planning, constructing, and developing Lansdowne on
the Potomac. (Compl. ¶ 25.) LCD Communications is also a Virginia limited liability company,
formed in 2000. (Comp. ¶ 35.)

[4] M.C. Dean is an engineering firm that designs and integrates complex electrical, electronic, and
telecommunications systems. (Compl. ¶ 17.) Beginning in April 2000, M.C. Dean created OPM
and OPV for the purpose of providing wireline telephone, video, and Internet services to the
residents of Lansdowne on the Potomac. (Compl. ¶¶ 34, 36.) OPM delivers video and internet
services to OpenBand and OPV delivers telephone services to OpenBand (Compl. ¶¶ 82-83.)

[5] OpenBand provides the services obtained from OBM and OBV to Lansdowne residents,
making OpenBand "the exclusive means by which [OPM] and [OPV] provide telephone, video
and internet services to the Lansdowne community." (Compl. ¶ 42.)

OpenBand is the exclusive wireline telecommunications services provider for Lansdowne on the Potomac.

*The Agreements.*

Plaintiff alleges that OpenBand was created "for the purpose of entering and effectuating various agreements granting it the exclusive right to provide communications services to the residents of the Lansdowne HOA." (Comp. ¶ 39.) There are effectively three agreements at issue in this case:

(1) A Telecommunication Services Agreement ("TSA") between Lansdowne HOA and OpenBand, signed on May 14, 2001 and approved by the plaintiff, Lansdowne HOA, on June 14, 2002. (Compl. ¶¶ 52, 93.) The TSA provides that OpenBand would deliver "Platform Services"[6] to every Lansdowne resident and that plaintiff (Lansdowne HOA) would be responsible for paying for those services. (Compl. ¶ 54.)[7] LCD controlled the Lansdowne HOA at the time this agreement was effected. (Compl. ¶ 93-98.)

(2) An exclusive easement granted to OpenBand on May 14, 2001, that gives OpenBand the exclusive right to provide telecommunications services to the Lansdowne Community. (Compl. ¶ 47.) LCD, the then-owner of the land that constitutes Lansdowne on the Potomac, originally granted this easement to LCD Communications on May 14, 2001; and LCD Communications granted the same easement to OpenBand on that same day. (Compl. ¶¶ 60-61, 66-67.) The Plaintiff, identified as the "future owner," and acting through its then president, who at the time was also the president of LCD, is a party to both easements.

(3) The First Amended and Restated Declaration of Covenants, Conditions and Restrictions for Lansdowne on the Potomac dated June 18, 2001 (the "Covenants, Conditions and Restrictions" or "CC&Rs"), which was written and accepted by LCD on behalf of the Lansdowne HOA (Compl. ¶ 86.). As discussed below, the TSA

---

[6] "Platform Services" are defined as "basic wireline telephone, video, and Internet services." (Compl. ¶ 53.) "Basic telephone service includes one telephone number, unlimited local calling, and access to long-distance carriers, operator services, and directory services. Basic Internet service includes 100BaseFX Ethernet connection to the home. Basic video (television) service includes analog and digital video delivered programming that includes a minimum of one-hundred twenty (120) channels." (Compl. ¶ 105.)

[7] The initial term of the TSA is twenty five years, with an exclusive and unilateral option by OpenBand to renew the TSA for four successive ten year periods, allowing the TSA to operate for as long as sixty-five years. (Compl. ¶ 111; Compl. Ex. 1 § 6.1.)

expressly references the CC&Rs, which "are a binding obligation of the HOA and enforceable against the HOA in accordance with their terms." (Compl. ¶ 90.)[8]

Under the arrangement implemented through these three agreements, OpenBand provides Platform Services to every resident of Lansdowne on the Potomac; and Lansdowne HOA pays OpenBand for that service and then recoups that amount from residents through monthly dues.[9] (Compl. ¶ 106.) The plaintiff alleges that the effect of these agreements is to prevent the Lansdowne community from using any other provider of wireline video, phone, and internet services; and through the enforcement of the easements, any alternative provider is effectively prevented from providing competing services to the Lansdowne on the Potomac residents. (Compl. ¶¶ 45-49.)

### III. Discussion

#### 1. Antitrust Claims

In Counts One through Four, plaintiff alleges that the various combinations and agreements among the defendants constitute illegal restraints on trade in violation of Section 1

---

[8] The Complaint also alleges and attaches an unsigned copy of a Communications Services Agreement between the plaintiff, OpenBand, OBM, OBV, and a homeowner. (Compl. Ex. 7.) This agreement is executed in connection with a homeowner's purchase of property at Lansdowne on the Potomac and sets forth the terms and conditions pertaining to the homeowner's receiving telecommunication services through OpenBand. (Compl. ¶ 117.) While it further implements the exclusivity at issue in this case, it does not otherwise directly bear on the specific legal issues raised in defendants' motions to dismiss.

[9] If a resident wishes to receive from OpenBand premium services above and beyond the Platform Services, OpenBand's basic bundled set of services, then that resident can contact OpenBand directly and OpenBand bills the resident directly for those services. (Compl. ¶ 107.) However, residents are not obligated to purchase premium services from OpenBand; under the TSA residents have the right to obtain such services, as well as those services included in Platform Services, from another provider. In the event that a resident is able to obtain telecommunication services from another (presumably wireless) provider, notwithstanding OpenBand's exclusive easement for wireline service, that resident will continue to be billed for "Platform Services" and will not be relieved of the obligation to pay for Platform Services. (Compl. Ex. 1, § 2.2.3.)

of the Sherman Act, 15 U.S.C. § 1, and a conspiracy to monopolize, monopolization, and

attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[10] A

Section 1 claim requires a showing that "the conspiracy produced adverse, anticompetitive

effects within the relevant product and geographic market."[11] *See Advanced Health-Care Servs.,*

*Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 144 (4th Cir. 1990) (quoting *Terry's Floor Fashions*

*v. Burlington Indus.*, 763 F.2d 604, 610 n.10 (4th Cir. 1985)). A Section 2 claim requires "the

possession of monopoly power,"[12] and, in evaluating that claim, "courts begin with a preliminary

inquiry into market definition, which serves as a tool to determine the defendant's market

power." *E.I. Du Pont De Nemours and Co. v. Kolon Industs., Inc.*, 637 F.3d 435, 441 (4th Cir.

2011).

The Complaint alleges in conclusory fashion all the required elements of its claims under

both Section 1 and Section 2 of the Sherman Act. However, the Complaint must, in addition,

state facts that make those claims "plausible" and not merely possible. *Iqbal*, 129 S. Ct. at 1949;

*Twombly*, 550 U.S. at 570. The existence *vel non* of anti-competitive effects under Section 1 or

---

[10] The plaintiff also alleges violations of the Virginia antitrust statutes. *See* Va. Code § 59.1-9.5-9.6. As discussed *infra* Part III.3, the Court declines to exercise its supplemental jurisdiction over those claims.

[11] The complete list of elements of a Section 1 claim is "(1) that the conspiracy produced adverse, anticompetitive effects within the relevant product and geographic market; (2) that the objects and conduct pursuant to the conspiracy were illegal; and (3) that the plaintiff was injured as a proximate result of the conspiracy." *Radford*, 910 F.2d at 144 (quoting *Terry's Floor Fashions*, 763 F.2d at 610 n.10).

[12] To assert a monopolization claim under Section 2 of the Sherman Act, the plaintiff must establish "(1) the possession of monopoly power; and (2) willful acquisition or maintenance of that power." *Kolon*, 637 F.3d at 441. Attempted monopolization under Section 2 requires a showing of "(1) the use of anticompetitive conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of success." *Id.* To establish a conspiracy to monopolize claim, "a plaintiff must show concerted action, a specific intent to achieve an unlawful monopoly, and commission of an overt act in furtherance of the conspiracy." *Radford.*, 910 F.2d at 150.

monopoly power under Section 2 must be measured by the relevant market. Therefore, the sufficiency of the Complaint as to all of plaintiff's antitrust claims necessarily depends in the first instance on whether the plaintiff has sufficiently alleged a market within which the defendant produced an anticompetitive effect or held monopoly power. *Kolon*, 637 F.3d at 439; *Radford*, 910 F.2d at 144.

There are two components of a market definition: the product market and the geographic market. *Kolon*, 637 F.3d at 441. For the purposes of these motions, the Court accepts as true the plaintiff's allegations that the relevant product market is the market for wireline telephone service, pay-television service, and high-speed wireline Internet access.[13] The Court will therefore assess only the legal sufficiency of the alleged geographic market. In that regard, the Court recognizes that market definition is often a "deeply fact-intensive inquiry" and that "courts hesitate to grant motions to dismiss for failure to plead a relevant market." *Id.* at 443 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)). Nevertheless, courts have also recognized that dismissal is appropriate where the complaint "defines a geographic market in an unreasonably and implausibly narrow manner . . . ." *Id.* at 444 (quoting *Allen v. Dairy Farmers of Am., Inc.* 748 F. Supp. 2d 323, 339 (D. Vt. 2010)).

The plaintiff alleges that "[t]he relevant geographical market for the purchase of wireline telephone, pay television, wireline high-speed Internet service, and bundled packages of these services is the Lansdowne on the Potomac development." (Compl. ¶ 143.) The plaintiff justifies this definition of the relevant market "because a consumer's ability to purchase these services depends on which carriers provide service to the consumer's individual home, and, on

---

[13] The Court makes no determinations as to the adequacy of the product market allegations under the *Twombly/Iqbal* standard.

information and belief, carriers typically choose to wire the entire development or not provide

service at all." *Id.* For this reason, plaintiff claims that "[t]he relevant geographic market does

not include areas near the Lansdowne on the Potomac development because residents do not

typically buy real estate or choose to move simply in order to purchase communication services

from a competing provider." *Id.* at ¶ 144. In response, the defendants argue that the geographic

area that constitutes Lansdowne on the Potomac is not a "plausible" market because it is too

narrowly defined on its face.

The relevant product market and the relevant geographic market must be evaluated as

follows:

> First, the line of commerce, i.e., the type of goods, wares, or merchandise, etc.,
> involved must be determined . . . on the basis of the peculiar facts to the case.
> Second, the area of effective competition in the known line of commerce must be
> charted by careful selection of the market area in which the seller operates, and to
> which the purchaser can practicably turn for supplies.

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). In other words,

"[t]he relevant geographic market inquiry focuses on that geographic area within which

the defendant's customers who are affected by the challenged practice can practicably

turn to alternative supplies if the defendant were to raise its prices or restrict its output."

*Kolon*, 637 F.3d at 441. "[B]ecause alternative supplies constrain an alleged

monopolist's ability to raise prices or exclude competition[,]" an alleged monopolist

cannot be said to have a monopoly if it raises prices and customers are reasonably able to

purchase supplies from another provider. *Id.* at 442. In addition, a proposed market must

"correspond to the commercial realities of the industry and be economically significant."

*Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). As the Supreme Court has

explained, "although the geographic market in some instances may encompass the entire

Nation, under other circumstances it may be as small as a single metropolitan area." *Id.* at 337.

Here, the plaintiff asserts that the relevant geographic market is the Lansdowne on the Potomac development itself, consisting of 2,155 single-family attached and detached homes. (Compl. ¶¶ 143, 26.) Within that market, the plaintiff argues that the defendants have market power because residents have no choice but to purchase their telecom services from OpenBand as a result of the agreements in place. Specifically, by virtue of the exclusive access easement that the Developer Defendants granted to OpenBand before developing the Lansdowne community, competitors are unable to access that residential neighborhood to compete with OpenBand for the residents' business. The plaintiff's theory is, in essence, that because the geographic market is defined by whether "customers who are affected by the challenged practice can practicably turn to alternative supplies," and individual Lansdowne residents cannot turn to alternative service providers, OpenBand has monopoly power over those residents. This theory, however, confuses market power with contract power.

While it is true that, today, residents in Lansdowne cannot turn to an alternative wireline supplier, the Lansdowne residents' inability to shop around for that service is the direct result of an exclusive *contract*. The fact of that contract does not establish that OpenBand has monopoly market power in the relevant market or had monopoly power before entering into its contracts with the Developer Defendants. In short, OpenBand's "contract power" over Lansdowne does not show that OpenBand has "monopoly power" over Lansdowne. The Eleventh Circuit has addressed the plaintiff's conflation succinctly:

> [W]hile a party who exercises contract power *may* have market power and *may* violate antitrust laws under some circumstances, the mere existence and exercise

of contract power does not show that a defendant had market power or violated the law. In other words, courts must attempt to ascertain a defendant's economic position in the relevant market, rather than its power pursuant to a particular contract, when considering whether a defendant has market power.

*Maris Distributing Co. v. Anhueser-Busch, Inc*, 302 F.3d 1207, 1219 (11th Cir. 2002); *see also*

*United Farmers Agents Assoc., Inc. v. Farmers Ins. Exchange,* 89 F.3d 233, 236-37 (5th Cir.

1996) ("Economic power derived from contractual agreements such as franchises . . . has nothing

to do with market power, ultimate consumers' welfare, or antitrust." (internal quotations

omitted)); *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000)

("Economic power derived from contractual arrangements affecting a distinct class of consumers

cannot serve as a basis for a monopolization claim.") (*abrogated on other grounds by*

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The fact that a service provider has substantial power over a customer by virtue of a

contract does not reveal much about the supplier's market power beyond that customer or in the

broader market. *Anhueser-Busch*, 302 F.3d at 1222. As the Supreme Court has recognized,

"even though a contract is found to be an exclusive-dealing arrangement, it does not violate the

[Sherman Act] unless the court believes it probable that performance of the contract will

foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric*,

365 U.S. at 327. The issue is not whether the exclusive contract has foreclosed options for

customers, it is whether the exclusive contract foreclosed *competition* amounting to "a

substantial share of the relevant market." *Id.* at 328. In determining the relevant market, the

Court's focus is not on the exclusive contract's effect on the Lansdowne residents, but on

OpenBand's position relative to other providers of telecom services.

When the relevant market is viewed in this fashion, as it must, it becomes clear that the

plaintiff has not alleged facts sufficient to support Lansdowne on the Potomac as a plausible

11

market.  For example, there are no facts that establish that any of the defendants had market power in any communication services market, however defined, at the time the exclusive dealing contractual arrangements were entered into.  Moreover, there are no facts that establish that the alleged market power defendants have at Lansdowne on the Potomac, acquired through contractual arrangements, translates into market power in any communications services market beyond Lansdowne on the Potomac. *See Wampler v. Sw. Bell Telephone Co.*, 597 F.3d 741 (5th Cir. 2010) (rejecting a similar attempt to define the relevant market as an individual MDU).  For these reasons, the plaintiff has not alleged facts that make it plausible that Lansdowne on the Potomac is a relevant market for antitrust purposes, as opposed to the broader market within which OpenBand competes, and competed in 2002, for similar contracts.[14]

For the above reasons, the Court concludes that plaintiff has failed to state a claim under the federal antitrust laws.

### 2.  The FCC Claim

In Count Seven of the Complaint, the plaintiff alleges that the defendants' activities violate Section 628 of the Act[15] and the 2007 Exclusivity Order. Based on that violation, plaintiff seeks a declaration that the exclusivity provisions of the various agreements are "void and unenforceable." (Compl. Request for Relief ¶ 5.)  For the reasons stated below, the Court concludes that plaintiff has stated a claim that OpenBand's exclusivity violates the 2007 Exclusivity Order.

---

[14] In fact, plaintiff alleges that OPM and OBV are certified to provide telecom services in areas other than just the Lansdowne at Potomac development. (Comp. ¶¶ 20-21.)

[15] Section 628 of the Act provides, in pertinent part, that "[i]t shall be unlawful for a cable operator . . . to engage in unfair methods of competition or unfair deceptive acts or practices . . ." in connection with certain types of programming to subscribers or consumers. 47 U.S.C. § 548(b).

The 2007 Exclusivity Order prohibits cable operators and other entities subject to Section 628[16] from executing or enforcing contractual provisions that give them the exclusive right to provide video programming services to "multiple dwelling units" or "MDUs," which includes "centrally managed real estate developments." *See* 2007 Exclusivity Order ¶ 7.[17] Lansdowne on the Potomac clearly falls within the definition of an MDU as the Complaint alleges it to be "a centrally managed residential real-estate development." (Compl. ¶ 26.) The plaintiff alleges that through the operation of the TSA, the exclusive easements, and CC&Rs, defendants are violating the 2007 Exclusivity Order, which renders the exclusivity provisions that defendants enforce through those contracts "null and void." *See* 2007 Exclusivity Order ¶ 31.

Defendants concede that OpenBand's exclusive easement "effectively bar[s] other providers of wired services from Lansdowne." (OpenBand Br. 22.) Nevertheless, they contend that the plaintiff has failed to state a claim for such a violation of the Act and the 2007 Exclusivity Order because: (1) the Order only reaches the TSA, which, by its terms, does not impose any exclusivity and no other agreement can be considered in determining whether the TSA imposes a prohibited exclusivity; (2) this Court's enforcement of the 2007 Exclusivity Order to invalidate OpenBand's exclusive easement would exceed the FCC's jurisdiction and the scope and intended reach of the Order, which is not intended to affect, and does not affect,

---

[16] These other entities include common carriers such as "local exchange carriers" and their affiliates that provide video programming directly to subscribers under Section 628(j) of the Act and operators of video systems under Section 653(C)(1). 47 U.S.C. §§ 522(7)(C), 548(j), 573(c)(1)(A).

[17] "[T]he term MDUs, for purposes of this *Report and Order*, also includes gated communities, mobile home parks, garden apartments, and other centrally managed residential real estate developments. All of these are collections of private individual households with residents remaining for lengthy, indefinite periods of time, each in a dwelling space that is distinctly separate but shares some common spaces requiring central management." 2007 Exclusivity Order ¶ 7 (internal citations omitted).

13

"private property rights;" (3) the FCC has issued a subsequent order in 2010 authorizing bulk billing arrangements such as those imposed on the plaintiff under the TSA; and (4) in any event, the FCC has primary jurisdiction over whether OpenBand's exclusivity violates the Order and this Court should therefore not adjudicate this issue but defer to that agency. The Court rejects each of these positions.

### A. The Plaintiff has stated a claim that the 2007 Exclusivity Order prohibits OpenBand's exclusivity.

The defendants do not contest that OpenBand is a cable operator subject to the Act and the Order. They contend, however, that the Order reaches only the TSA, not any other agreements, and the TSA, by its terms, does not give OpenBand any exclusivity. In this regard, the defendants point to the provision of the TSA that preserves for each Lansdowne resident "the option . . . in their sole discretion, to obtain any Services, including Platform or Premium Services, from any and all providers other than [OpenBand]." (Compl. Ex. 1, Article 2 § 2.2.3.) Central to this position is defendants' contention that "the TSA does not expressly incorporate any other agreements, does not cross-reference or duplicate the provisions of any other agreements, and does not require compliance with any other agreements" and for that reason, "[n]othing in the TSA or the other agreements Plaintiff seeks to invalidate evidences an intent by the parties to construe the agreements as one integrated contract." (OpenBand Reply 15.)

First, and contrary to the primary premise of defendants' position, the TSA is not the only agreement that is subject to the 2007 Exclusivity Order. Rather, the Court concludes that the 2007 Exclusivity Order reaches and operates directly on OpenBand's exclusive easement, which falls squarely within the Order's prohibitions. The Order provides that "no cable operator . . . shall enforce . . . any provision in a contract that grants it the exclusive right to provide any video programming (alone or in combination

14

with other services) to a MDU." 2007 Exclusivity Order ¶ 31. The defendants do not

contest that OpenBand's exclusive easement is a contract. (OpenBand Reply 18) ("That

easements are contracts is undisputed."). The plaintiff is a party to that contract, together

with OpenBand and LCD Communications.[18] That contract, by its terms, grants

OpenBand the exclusive right to access Lansdowne on the Potomac in order to provide

wired video programming. (Compl. Ex. 3 § 2(a).)[19]

     Second, the Court concludes that the 2007 Exclusivity Order prohibits

OpenBand's exclusivity based on OpenBand's contract rights under the TSA. The TSA

expressly references and effectively incorporates other agreements, the effect and

purpose of which are to give OpenBand exclusive access, through the TSA, to the

Lansdowne residents. More specifically, under the TSA's terms (a contract between

OpenBand and the plaintiff) the plaintiff covenants that the CC&Rs are binding and

enforceable against it and further covenants that it will not amend the CC&Rs "such that

the amendment would (i) result in a termination of [the TSA] or allow the [plaintiff] to

---

[18] The easement reads:

> THIS DEED OF EASEMENT ("Easement") is made this 14 day of May, 2001,
> by and between LCD COMMUNICATIONS LLC, a Virginia limited liability
> company ("Grantor"); and OPENBAND AT LANSDOWNE LLC, a Virginia
> limited liability company ("Grantee"); and LANSDOWNE ON THE POTOMAC
> HOMEOWNERS ASSOCIATION INC., a Virginia non-stock corporation
> ("Future Owner").

(Compl. Ex. 3, p. 1.)

[19] OpenBand's easement provides that it is an "[e]xclusive easement for the purpose of
constructing, operating, maintaining, adding to, altering or replacing . . . present or future
underground or above ground telecommunications . . . lines, cables . . . for the collection,
provision and distribution of video, telephonic, internet, data services or other communications . .
. and its transmission on, in, through and across the said Property of Owner." (Compl. Ex. 3, §
2(a).)

terminate [the TSA] or (ii) have a materially adverse effect on [OpenBand]." (Compl.

Ex. 1, p. 13, Article 1, § 6.4(l)). The CC&Rs, in turn, specifically reference OpenBand's

exclusive telecommunications easement and prohibit the plaintiff or the Lansdowne

residents from granting other easements or taking action that would interfere with "the

exclusive rights of [OpenBand], " thereby preserving OpenBand's ability to prevent any

competitor from providing wired access to plaintiff's residents.[20] *(See, e.g.,* Compl. Ex.

6, §§ 3.8(e), 4.7.1, 4.7.2, 8.1.1(v), 8.1.3(i), 8.1.4(i); 8.1.10(c)). Overall, the plaintiff

plausibly alleges that the TSA, the CC&Rs, and OpenBand's exclusive easement

constitute a unitary contractual matrix that effectively eliminates the plaintiff's ability to

give other cable companies wired access to plaintiff's residents in competition with

OpenBand, precisely the situation addressed and prohibited by the 2007 Exclusivity

Order.  For these reasons, OpenBand's exclusive easement can hardly be deemed "wholly

extraneous" to the TSA or the 2007 Exclusivity Order, as the defendants contend. *(See*

OpenBand Reply 14.)

Defendants essentially argue that they have effectively avoided the prohibitions of

the Order by "debundling" the enabling exclusivity and placing the effectuating

contractual rights in a series of separate agreements entered into by affiliated, but distinct,

entities.  But the TSA, the CC&Rs, and OpenBand's exclusive easement are inextricably

related, entered into within a short period of time of each other by affiliated entities, all

for the purpose of establishing interlocking obligations that create an impregnable,

---

[20] For example, Section 4.7.2 of the CC&Rs provides that "[t]he Declarant [LCD] . . . or its designees shall have the right, but not the obligation, to install and provide an exclusive private utility systems . . .*[s]ubject to . . . the exclusive rights of a Telecommunications Provider pursuant to one or more easements encumbering the Property* . . . ." (Compl. Ex. 6 § 4.7.2 (emphasis added).)

exclusive enclave for OpenBand's delivery of telecommunication services at Lansdowne on the Potomac. *See also* 47 U.S.C. § 522(5) ("cable operator" includes anyone who "controls or is responsible for, *through any arrangement*, the management or operation" of a cable system.) (emphasis added).

For the above reasons, the Court cannot conclude, as defendants contend, that as a matter of law, based on the allegations of the Complaint and exhibits, the 2007 Exclusivity Order does not prohibit OpenBand's exclusivity. Rather, the Court concludes at this stage of the proceedings that plaintiff has sufficiently alleged that the 2007 Exclusivity Order prohibits OpenBand from enforcing its exclusivity with respect to providing video services to plaintiff's residents.

## B. Applying the 2007 Exclusivity Order to OpenBand's exclusivity does not exceed the jurisdiction of the FCC.

The defendants claim that "the FCC has no jurisdiction over easements over private property" because "[n]othing in the Communications Act or the FCC's rules permit the FCC to limit or restrict the conduct of private real property owners with respect to the conveyance of and rights to use their property." (OpenBand Reply 15.) It also claims in this regard that the FCC expressly acknowledged such limitations on its authority in the 2007 Exclusivity Order; and that as a result, "[t]o the extent that exclusivity may result from such easements over private property, that circumstance would be beyond the scope of the FCC's authority granted to it by Congress in the Communications Act of 1934 and could not be prohibited by the FCC." (OpenBand Br. 22.) The defendants' position is meritless.

The validity of the 2007 Exclusivity Order was considered by the United States Court of Appeals for the District of Columbia in *National Cable & Telecomms. Ass'n v. F.C.C.*, 567 F.3d 659 (D.C. Cir. 2009). After reviewing the basis and rationale for the Order, the D.C. Circuit

concluded that the Commission, in adopting the Order, "acted well within the bounds of both section 628 and general administrative law." *Id* at 661. In affirming the validity of the Order, it specifically rejected a challenge on the grounds, similar to those advanced here, that the exclusivity ban impermissibly regulates the real estate industry, which lies outside the Commission's jurisdiction. *See id.* at 666 ("Real estate petitioners' separate attack on the Commission's authority has little merit. . . . The terms of the challenged prohibition apply only to cable companies, . . . and they neither require nor prohibit any actions by MDUs.")

There is nothing that places OpenBand's exclusivity easement beyond the reach of the 2007 Exclusivity Order. First, there is nothing in the 2007 Exclusivity Order that exempts its application to private easements. Rather, the Order covers all "contracts containing clauses" that give a cable operator exclusive access for the provision of video services. 2007 Exclusivity Order ¶ 1. As referenced above, the defendants expressly admit that an easement is a contract; and OpenBand's exclusive easement is precisely such a "contract containing clauses" that allows OpenBand to provide wireline video services on an exclusive basis. Second, the FCC's expressed concerns over private property rights pertained to the rights of a homeowners association, such as the plaintiff, or other property owners to exclude certain providers, and the lack of any obligation on their part to permit access to every cable operator who wants to provide services. 2007 Exclusivity Order at ¶ 37.[21] But those pronouncements in no way affect the

---

[21] The Order provides at ¶ 37:

> Moreover, incumbent cable operators [i.e. OpenBand] will still be able to use their equipment in MDUs to provide service to residents who wish to continue to subscribe to their services. Finally, we note that the rule we adopt today does not require that any new entrant be given access to any MDU. A MDU owner still retains the rights it has under relevant state law to deny a particular provider the right to provide service to its property. We merely prohibit the enforcement of existing exclusivity clauses and the execution of new ones by cable operators. While this Order prohibits the enforcement of existing

underlying, fundamental prohibition embodied in the 2007 Exclusivity Order against exclusive

contractual arrangements with a particular cable operator. The Order's application to prohibit

OpenBand from enforcing its exclusivity will not *affirmatively* require the plaintiff or

Lansdowne residents to open their property to every provider.

The defendants' position that OpenBand's exclusive easement is beyond the reach of the

FCC through the 2007 Exclusivity Order also flies in the face of the FCC's expressed concerns

and identified harms that it sought to a prevent through the Order. As the Order itself states:

> By far the greatest harm that the exclusivity clauses cause residents of MDUs is that they deny those residents another choice of [video] service and thus deny them the benefits of increased competition. . . . The fact that an incumbent cable operator may face competitive pressures on its pricing in a franchise area surrounding or adjacent to a MDU does not mean that the residents of a MDU served by the same cable operator will reap the benefits of such competition, including the option to choose among competitive providers, some of which may provide a reduced-priced bundled package. This is particular true when the incumbent cable operators and MDU owners sign contracts before a competitive provider enters the market, a practice that the record in this proceeding indicates is quite common.

2007 Exclusivity Order ¶ 17. The Order continues:

> Exclusivity clauses can cause other harms to MDU residents. A MDU owner may grant exclusivity to one [video provider] based on the available choice of service providers at a given time, and in doing so bar entry into the MDU by a more desirable but later-arriving [video provider]. Or, the person who grants exclusivity to one [video provider] may be the developer or the builder of a MDU, who may grant exclusivity against the long-term interests of the residents and soon thereafter relinquish control of the MDU.

Order at ¶ 22. The application and enforcement of the 2007 Exclusivity Order that plaintiff seeks

would occur precisely within the circumstances that motivated the FCC to act. And it would be

anomalous that a developer and cable operator could so easily evade the FCC's broad and

---

exclusivity clauses, it does not, on its own terms, purport to affect other provisions in contracts containing exclusivity clauses.

comprehensive remedial order merely by placing the prohibited exclusivity provisions within a

contract labeled an "easement" rather than a "contract" or "agreement."

### C. The 2010 Bulk Billing Order does not authorize OpenBand's exclusivity.

In 2010, the Commission adopted an Order that "bulk billing" arrangements do not

violate the Act ("2010 Bulk Billing Order").[22] The TSA does impose a "bulk billing"

arrangement that the 2010 Bulk Billing Order sanctions.[23] Based on the 2010 Bulk Billing Order,

the defendants argue that the 2007 Exclusivity Order cannot invalidate OpenBand's exclusivity

because that exclusivity is billed to the plaintiff, and through the plaintiff to the residents, by way

of a bulk billing arrangement.

Defendants' argument misses the thrust of plaintiff's position. Plaintiff is not challenging

the bulk billing arrangement, but the underlying exclusivity that is billed to the plaintiff through

that arrangement; and in that regard, the 2010 Bulk Billing Order makes clear that its approval of

bulk billing arrangements in no way affects the prohibition on exclusivity contracts imposed

under the 2007 Exclusivity Order. *See, e.g,* 2010 Bulk Billing Order ¶¶ 1, 2, 26.  Accordingly, to

the extent that plaintiff establishes that OpenBand is in violation of the 2007 Exclusivity Order,

that violation is not sanctioned under the 2010 Bulk Billing Order.

---

[22] *In the Matter of Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, Second Report and Order, 25 FCC Rcd 2460 (2010).

[23] The 2010 Bulk Billing Order defines bulk billing as follows:

> This is an arrangement in which one [video provider] provides video service to every resident of an MDU, usually at a significant discount from the retail rate that each resident would pay if he or she contracted with the [video provider] individually. Bulk billing arrangements do not hinder significantly, much less prevent, a second video service provider from serving residents in the MDU.

2010 Bulk Billing Order ¶ 2. The TSA on its face is just this type of arrangement.

**D. The Court should not defer to the FCC under the doctrine of primary jurisdiction.**

Defendants contend that the Court should not decide whether OpenBand's exclusivity violates the 2007 Exclusivity Order but instead defer to the FCC under the doctrine of primary jurisdiction. Such a deferral would be unwarranted. The doctrine of primary jurisdiction is intended to address those situations where the special expertise of an administrative agency is necessary to resolve "issues of fact not within the conventional experience of judges or cases which require the exercise of administrative discretion." *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996); *see also Reiter v. Cooper*, 507 U.S. 258, 268 (1993) ("[Primary Jurisdiction] is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency."). This case requires the application of an established FCC Order to alleged facts, an exercise well within the Court's competence and experience. *See AT&T Commc'ns of Virginia v. Bell Atlantic-Virginia, Inc.*, 35 F. Supp. 2d 493, 498 (E.D. Va. 1999).[24] In fact, the Act specifically authorizes the Court to exercise jurisdiction where a party is alleged to have disobeyed an FCC order, which is exactly the situation here. *See* 47 U.S.C. § 401(b) ("If any person fails or neglects to obey an order of the Commission . . . any party injured thereby . . . may apply to the appropriate district court of the United States for the enforcement of such order.").

---

[24] In *Advamtel, LLC v. AT&T Corp.*, the court, in a helpful example to illustrate when invoking the doctrine of primary jurisdiction would be appropriate, observed that the "reasonableness" of a carrier's filed tariff would be appropriately referred to the FCC because "that question requires the technical and policy expertise of the agency . . . . On the other hand, the doctrine of primary jurisdiction does *not* apply to an action seeking the enforcement of an established tariff." 105 F. Supp. 2d 507, 511 (E.D. Va. 2000). This case is more akin to the enforcement of an established tariff because it is applying an established rule instead of determining the "reasonableness" of a proposed rule.

### E. The Complaint states a claim against the Developer Defendants.

The Developer Defendants (LCD and LCD Communications) argue that even if the 2007

Exclusivity Order prohibits OpenBand and the other OpenBand Defendants from enforcing

OpenBand's exclusivity, the Developer Defendants are not "cable operators" or any other entity

subject to Section 628 of the Act.

The Act defines the term "cable operator" as

> any person or group of persons (A) who provides cable service over a cable
> system and directly or through one or more affiliates owns a significant interest in
> such cable system, or (B) who otherwise controls or is responsible for, through
> any arrangement, the management and operation of such a cable system.

47 U.S.C. § 522(5). As alleged in the Complaint, LCD owns LCD Communications,

which, along with SPE, owns OpenBand, a cable operator. The precise role and

relationship, in terms of control, management, and responsibility, between and among

these various entities is not entirely clear. However, the Court must conclude at this

preliminary stage that the factual allegations of the Complaint are sufficient to make

"plausible" that LCD and LCD Communications are each a "person or group of persons .

. . who . . . controls or is responsible for, through any arrangement, the management and

operation of such a cable system." 47 U.S.C. § 522(5).  Because plaintiff has sufficiently

alleged facts that make it plausible that the Developer Defendants fall within the

definition of a "cable operator" that is violating the 2007 Exclusivity Order, their motion

to dismiss Count Seven as to them will be denied.[25]

---

[25] At the hearing held on defendants' motions to dismiss, the Developer Defendants stated that it
no longer has an ownership interest in OpenBand.  The Court's ruling is necessarily based on the
allegations of the Complaint and does not, of course, preclude the defendants from proving facts
other than those alleged.

### 3. State Law Claims

In Counts One through Four, the plaintiff alleged violations of Virginia's antitrust laws.

In Counts Five, Six, and Eight through Eleven, the plaintiff alleges the following state law

claims:

- Count Five: Declaratory Judgment that Transactions are Void for Self-dealing. Va. Code § 13.1-691.
- Count Six: Easements are Void as Unlawful and Against Public Policy.
- Count Eight: Conspiracy to Injure Another in its Reputation, Trade, and Business. Va. Code. §§ 18.2-499, 500.
- Count Nine: Common Law Civil Conspiracy.
- Count Ten: Declaratory Judgment that Contract is Void for Vagueness.
- Count Eleven: Declaratory Judgment that Contract is Unconscionable.

The plaintiff invokes this Court's supplemental jurisdiction over these claims pursuant to 28

U.S.C. § 1367(a).

The Court declines to exercise its supplemental jurisdiction over these state law claims.

Their resolution would embroil this Court in several complex and novel issues under Virginia

law. Moreover, given the dismissal of the federal antitrust claims in Counts One through Four,

the only remaining federal claim is set forth in Court Seven, which would appear to require very

little, if any, discovery to adjudicate and may very well be susceptible to complete resolution

through summary judgment proceedings. On the other hand, the state law claims will likely

involve extensive discovery into issues irrelevant to Count Seven. As a result, these state law

claims would likely predominate over the only claim over which this Court has original

jurisdiction. The Court therefore declines to exercise its supplemental jurisdiction over those

state law claims pursuant to 28 U.S.C. § 1367(c)(1) and (2). The Court will dismiss those claims

without prejudice.

## IV. Conclusion

The defendants' motions to dismiss the plaintiff's federal antitrust claims are granted and Counts One, Two, Three, and Four are dismissed with respect to those federal claims. The defendants' motions to dismiss plaintiff's Count Seven, which alleges a violation of the 2007 Exclusivity Order, are denied as to all defendants. The Court declines to exercise jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. § 1367(c)(1) and (2).

An appropriate Order will issue.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
November 22, 2011