UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LANSDOWNE ON THE POTOMAC )
HOMEOWNERS ASSOCIATION, INC., )
)
Plaintiff, )
)
v. ) No. 1:11-cv-872 (AJT/TCB)
)
OPENBAND AT LANSDOWNE LLC, )
*et al.*, )
)
Defendants. )
_____ )

## <u>MEMORANDUM OPINION</u>

The developer for the residential community Lansdowne on the Potomac selected

defendant M.C. Dean, Inc. ("M.C. Dean") to provide a telecommunications network for

Lansdowne residents.  Thereafter, the developer, both on its own behalf and also on behalf of the

Lansdowne on the Potomac Homeowners Association, Inc. ("Lansdowne HOA"), which it then

controlled, entered into agreements with M.C. Dean's newly created affiliate defendant

OpenBand at Lansdowne LLC ("OpenBand"), in which the developer also held an interest.

Those agreements included a telecommunications services agreement (the "TSA") and also a

telecommunications easement that granted OpenBand exclusive access to the Lansdowne

community.  As a result of these agreements, OpenBand obtained an exclusive arrangement for

the provision of wireline telecommunication services to the Lansdowne development and its

residents.

Section 628 of the Communications Act (the "Act") states that it "shall be unlawful for a

cable operator . . . to engage in unfair methods of competition or unfair or deceptive acts, the

purpose or effect of which is to hinder significantly or to prevent any multichannel video

1

programming distributor from providing satellite cable programming or satellite programming to subscribers or consumers." 47 U.S.C. § 548(b).  In 2007, pursuant to its authority under the Act, the Federal Communications Commission ("FCC") issued an order that prohibits certain exclusive contractual arrangements with respect to video programming services, finding that such arrangements "harm competition" and declaring such arrangements "null and void" (the "Exclusivity Order").

Lansdowne HOA now challenges OpenBand's exclusivity arrangement under the FCC's Exclusivity Order. They seek both a declaration that the contractual provisions effecting that arrangement are "null and void" insofar as they pertain to video programming services and also an injunction with respect to the continued enforceability of those provisions insofar as they permit that video programming exclusivity. Defendants concede that OpenBand enjoys an exclusivity with respect to wireline video programming services. They contend, however, that the Exclusivity Order does not reach, and therefore does not invalidate, the contractual provisions that operate to grant OpenBand that exclusivity. They also contend that Lansdowne HOA does not have standing to bring this challenge under the Exclusivity Order and that, in any event, such a challenge is now time barred.

The parties have filed cross-motions for summary judgment. For the reasons discussed below, the Court concludes, as a matter of law based on undisputed facts, that Lansdowne HOA has standing to challenge the contractual arrangements in place for video programming services, that this action is not time barred, and that the Exclusivity Order prohibits OpenBand from acting as the exclusive provider of video programming services to the Lansdowne community. The Court will therefore enjoin the defendants from enforcing those contractual provisions in place between the parties for that purpose.

2

# I. BACKGROUND[1]

## A. The Parties

The plaintiff, Lansdowne HOA, is a homeowners association formed in December 2000 under Virginia law by Lansdowne Community Development, LLC, the developer of Lansdowne on the Potomac (the "Developer"). The Lansdowne community consists of approximately 850 acres, on which 2,155 single family attached and detached homes have been constructed. The residents of the Lansdowne community own their homes and also share an interest in common spaces that require central management.

The defendants consist of M.C. Dean, OpenBand, OpenBand Multimedia, LLC ("Multimedia"), OpenBand SPE, LLC ("OBS"), and OpenBand of Virginia, LLC ("OBV").[2] M.C. Dean is the sole member of Multimedia, OBV, and OBS. OBS is the sole member of OpenBand,[3] thereby making Multimedia, OBS and OBV first-tier, wholly owned subsidiaries of M.C. Dean and OpenBand a second-tier, wholly owned subsidiary of M.C. Dean.

M.C. Dean is a technical services contractor that specializes in the design, installation, and operation of power, electronic, and communications systems.[4] OBV provides telephone

---

[1] Unless indicated otherwise, the Court finds that the facts set forth in this Memorandum Opinion are undisputed in accordance with Local Civil Rule 56(B).

[2] Originally joined as defendants were the Developer, and its wholly owned subsidiary, LCD Communications LLC, both of whom were voluntarily dismissed pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). [Doc. Nos. 45 and 46].

[3] OpenBand was initially owned by both OBS and LCD Communications, an affiliate of the developer, which transferred its ownership interest to OBS prior to this litigation. *See* Pl.'s Ex. 29.

[4] According to the defendants, "M.C. Dean, along with its OpenBand subsidiaries, [Multimedia] and OBV, was the only company that could satisfy the Developer's demands for telecommunications services." Def.'s Br. in Supp. of Summ. J. 3 (hereinafter "Def.'s S.J. Br.").

services. Multimedia is a video and internet services provider, certified in November 2001 by the FCC to operate a type of cable services system known as an open video system ("OVS"), and thereafter authorized by Loudoun County to operate an OVS in Loudoun County. OBS is, in effect, a holding company for OpenBand. In summary, defendants OpenBand, OBS, Multimedia, and M.C. Dean are involved with video programming services; OBV is not.

OpenBand has no employees of its own; and Multimedia employees perform OpenBand's business functions. Defendants all share the same office space. Pl.'s Br. in Supp. of Summ. J. 9, at ¶ 24 (hereinafter "Pl.'s S.J. Br."). Each defendant has its own tax identification number, separate bank accounts, and separate records for capital assets; employee expenses are allocated between the entities, and separate balance sheets are generated for each entity. Def.'s Exs. 30-32, 34-36. OpenBand has entered into an agreement with Multimedia for the provision of video programming and internet services and with OBV for the provision of telephone services to the Lansdowne community.

M.C. Dean, OpenBand, and Multimedia all have at least two common M.C. Dean executives serving as directors: James Brabham, who serves as Executive Vice President of M.C Dean and William Dean, who serves as Chief Executive Officer of M.C. Dean and exercises ultimate decision making authority. Pl.'s Ex. 5, at 24-28.[5] Mr. Dean has also signed various agreements and other legal documents as the President of M.C. Dean, OpenBand, Multimedia, and OBV, including certain guarantees by M.C. Dean with respect to various obligations of its subsidiaries, including those of OpenBand. *See* Pl.'s Exs. 15, 17, 46, 47, 48; *see also* Pl.'s S.J. Br. 9, at ¶ 26. Mr. Brabham is held out to be "Chief Operating Officer of OpenBand" and

---

[5] Mr. Brabham testified that he was "not quite sure who else is on the [executive board] these days" besides himself and William Dean. Pl.'s Ex. 5, at 10-11.

provides the overall management for M.C. Dean's affiliated entities. *See* Pl.'s Ex. 5, at 9-11; Pl.'s Ex. 44, at 2.

### B. The Agreements

There are five contractual commitments that pertain to this dispute: (1) The TSA, entered into on July 24, 2001; (2) OpenBand's exclusive telecommunications easement, granted to OpenBand on May 14, 2001; (3) First Amended and Restated Declaration of Covenants, Conditions and Restrictions for Lansdowne on the Potomac, dated June 18, 2001 (the "CC&Rs"); (4) a Multi-Media Network Services Agreement, dated July 24, 2001, between OpenBand and Multimedia for Multimedia to supply and transmit video programming over OpenBand's infrastructure; and (5) the Communications Services Agreement ("Three-Way Agreement") between each homeowner, Lansdowne HOA, and OpenBand, Multimedia, and OBV. Pl.'s Exs. 8, 4, 9, 17; Def.'s Ex. 17.

(1) The TSA between Lansdowne HOA and OpenBand, formally titled "Agreement to Obtain Telecommunications Services," sets forth the parties' rights and obligations for the provision of telecommunications services to the Lansdowne residents.[6] The TSA grants to OpenBand the right to "(i) be the provider or arrange for the provision of the Platform Services to Homeowners *so that [Lansdowne HOA] shall not engage any other provider of Platform Services* and (ii) non-exclusively provide or arrange for the provision of the Premium Services or Supplemental Service."[7] Pl.'s Ex. 8, at 4, § 2.1 (emphasis added).  The TSA also obligates

---

[6] The parties entered into the TSA when the Developer controlled the Lansdowne HOA and had an ownership interest in OpenBand. *See supra* note 3.

[7] "Platform Services" are, in effect, basic wireline telephone, video, and Internet services; video programming included within Platform Services is a minimum of "120 channels of video and digital music programming." Pl.'s Ex. 8, at Ex. A.  "Premium Services" are higher quality options for wireline telephone, video, and Internet services, including, with respect to video programming, premium channels such as HBO and Showtime. *Id.* at Ex. C. "Supplemental

OpenBand to "design, install, and operate (or cause to be designed, installed and operated) at its own expense, the Infrastructure to provide Services under the terms set forth herein." *Id.* Under the TSA, Lansdowne HOA is responsible for paying for Platform Services on behalf of every Lansdowne resident, regardless of whether the resident uses or agrees to pay for those services. Nevertheless, the TSA expressly permits Lansdowne residents to obtain any services, including Platform Services, from other providers. However, in no event will a resident "be relieved of its obligation to pay for Platform Services . . . ." *Id.* at 6, § 2.2.3. As discussed below, the TSA also makes contractually enforceable, as between OpenBand and Lansdowne HOA, certain land use restrictions and covenants recorded by the Developer, referred to as the CC&Rs. *Id.* at 13, § 6.4(l).

The TSA does not require that OpenBand itself actually construct the required infrastructure or supply the actual telecommunications services to Lansdowne residents or that it use any particular telecommunications provider or other entity for those purposes. *Id.* at 4, § 2.1.1 ("[OpenBand] may engage one or more third party service providers to provide one or more of the Services"). As discussed below, OpenBand entered into an agreement with Multimedia in order to satisfy its contractual obligations under the TSA, which included a license to Multimedia to use OpenBand's infrastructure and exclusive easement.

The TSA has an initial term of twenty-five years; and OpenBand has the option to renew the TSA for four ten-year periods, resulting in a possible overall term of sixty-five years. *Id.* at 10, § 6.1. Lansdowne may terminate the TSA if OpenBand fails to provide services at a required

---

Services" are those communications services that are not defined as either Platform or Premium Services. *Id.* at 3.

level, subject to certain requirements for notice and opportunity to cure, and exhaustion of a dispute resolution procedure. *Id.* at 11, § 6.4.

(2) Another set of agreements grants to OpenBand "exclusive easements . . . for the purpose of constructing, operating, maintaining, adding to, altering or replacing (collectively, "Administering" or "Administer") [the telecommunications infrastructure] for the collection, provision and distribution of video, telephonic, internet, data services or other communications, data or media (collectively "Utilities") and its transmission on, in, through and across [the Lansdowne community]." Pl.'s Ex. 4, at § 2(a).[8] Under the terms of the easement, the "exclusive easements . . . shall . . . be deemed to reserve solely to [OpenBand] the right to Administer Utilities on, under and across the Property such that . . . no other person or entity shall be entitled to Administer any Utilities on, under or across the Property without the written consent of [OpenBand] . . . . [Developer] and [Lansdowne HOA] covenant that for the duration of this

---

[8] This easement has been the subject of several different grants and reservations:

    (a) On May 14, 2001, and in exchange for $1.00 in consideration, the Developer initially granted to LCD Communications the easement labeled "Exclusive Easement for Telecommunications Services at Lansdowne on the Potomac." That same day, LCD Communications granted that same easement to OpenBand, also in exchange for $1.00 in consideration. Lansdowne HOA, identified as the "future owner," and acting through its then President, who at the time was also the President of the Developer, ratified both easements. Pl.'s Ex. 4, at 13-14; *see also* Pl.'s Ex. 19, at 1-3.

    (b) This exclusive easement, initially granted as a blanket easement, contemplated that it would be subsequently modified, but "[t]he contemplated change from a blanket easement to a specific detailed easement shall in no way be deemed to change, reduce, or modify the intent of the Grantor to grant an exclusive and perpetual telecommunications easement to [OpenBand] in accordance with the terms hereof." Pl.'s Ex. 4, at § 2(a). The exclusive easement was modified as contemplated on August 28, 2002 without affecting "the rights of [OpenBand] to be the sole exclusive person or entity to Administer and Operate Utilities on, under and across the entire portion of the property encumbered by the [exclusive easement]." Pl.'s Ex. 19, at § 4. "Utilities" were defined to include, among other things, telecommunications services.

7

Easement they shall not grant any easement to Administer any Utilities on, under, or across the Property." *Id.* § 8. As discussed below, certain infrastructure, owned by OpenBand, was laid within that easement.[9]

(3) A set of contractual commitments are set forth in the CC&Rs. *See* Pl.'s Ex. 9. Initially recorded in the land records by the Developer on behalf of Lansdowne HOA as land use restrictions, the CC&Rs were expressly incorporated by reference into the TSA. Pl's Ex. 9, at 1; Pl's Ex. 8, at 13, § 6.4(l). Specifically, under the TSA, Lansdowne HOA "covenants that the CC&Rs are a binding obligation of the HOA and enforceable against the HOA in accordance with their terms. The HOA covenants not to amend the CC&Rs such that the amendment would . . . have a materially adverse effect on [OpenBand]." Pl.'s Ex. 8, at 13, § 6.3(l). The CC&Rs, in turn, specifically reference the exclusive easement and prohibit Lansdowne HOA or the Lansdowne residents from granting other easements or taking action that would interfere with "the exclusive rights of [OpenBand]."[10] *See e.g.,* Pl. Ex. 9, at §§ 3.8(e), 4.7.1, 4.7.2, 8.1.1(v), 8.1.3(i), 8.1.4(i), 8.1.10(c). The CC&Rs further affirm that OpenBand's "[r]ights with respect to the private utility system . . . and the services provided through such private utility system are exclusive, and *no other Person may provide such services to the Property.*" *Id.* at § 4.7.2 (emphasis added).

---

[9] OpenBand also owns the final connection to each of the houses in Lansdowne together with an easement through which those connections were laid.

[10] The CC&Rs also make clear that any easements granted by Lansdowne for utilities are ". . . [s]ubject to . . . the exclusive rights of a Telecommunications Provider pursuant to one or more easements encumbering the Property . . . ." Pl.'s Ex. 9, at § 4.72.

(4) Also relevant to this dispute is the Multi-Media Network Services Agreement, dated July 24, 2001, between OpenBand and Multimedia and OBV.[11] Pl.'s Ex. 17. Under that agreement, Multimedia agrees to supply video programming content and to actually transmit that content through the infrastructure contained in OpenBand's exclusive easement. *Id.* at § 2.1. For that purpose, OpenBand grants a license to Multimedia to use OpenBand's exclusive easement. *Id.* Multimedia also acknowledges that it acts "on OpenBand's behalf" with respect to regulatory issues and as OpenBand's "appropriately qualified and regulated sub-contractor." *Id.*

(5) Each resident of Lansdowne was required at the time of purchase to enter into the Communications Services Agreement, also referred to as "the Three-Way Agreement," between the resident, Lansdowne HOA, and OpenBand, Multimedia, and OBV. *See* Def.'s Ex. 17. Under that agreement, the resident agrees to pay for Platform Services; and the parties acknowledge, among other things, that OpenBand has subcontracted to Multimedia for video services. *Id.* at 2.

## C.  The FCC's Exclusivity Order

In 2007, following the notice and comment process, the FCC issued the Exclusivity Order, which addressed exclusivity arrangements between multichannel video programming distributors ("MVPDs") and multiple dwelling units ("MDUs"). *Exclusive Service Contracts for Provision of Video Services in Multiple Dwelling Units and Other Real Estate Developments*, 22 F.C.C.R. 20,235 (2007) (the "Exclusivity Order" or "Order"). In the Exclusivity Order, the FCC considered whether exclusivity arrangements in video services harmed competition and

---

[11] William Dean, the CEO of M.C. Dean, signed the Multi-Media Services Agreement on behalf of OpenBand, Multimedia, and OBV as those entities' President. Pl.'s Ex. 17, at 61. Because OBV provides telephone service and the Exclusivity Order pertains only to video programming services, OBV's role and services are not within the scope of the Exclusivity Order.

concluded that such arrangements had a net effect of undercutting competition and broadband

deployment. The arrangements that most concerned the FCC were those that barred access

altogether. As the FCC explained, "[t]he most exclusionary exclusivity clauses prohibit any

other MVPD from any access whatsoever to the premises of the MDU building or real estate

development." *Id.* at ¶ 1, n.2. In order to eliminate the effect of such clauses and their effect on

competition, the FCC decided to prohibit altogether certain exclusivity clauses with the

following language contained in the Exclusivity Order, promulgated as 47 C.F.R. § 76.2000:

> (a) *Prohibition.* No cable operator or other provider of MVPD service subject to 47
> U.S.C. § 548 shall enforce or execute any provision in a contract that grants to it the
> exclusive right to provide any video programming services (alone or in combination
> with other services) to a MDU. All such exclusivity clauses shall be null and void.[12]

The validity of the Exclusivity Order was challenged and upheld in *Nat'l Cable & Telecomms. v.*

*F.C.C.*, 567 F.3d 659, 661 (D.C. Cir. 2009).

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v.*

*Techs. Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking

summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S.

at 248. Once a motion for summary judgment is properly made and supported, the opposing

party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v.*

---

[12] MVPDs include, for purposes of the Exclusivity Order, cable operators and open video
systems operators. *See* Exclusivity Order ¶ 51.

*Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original)). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

The nonmoving party may rebut the motion for summary judgment "by any of the kinds of evidentiary materials listed in Rule 56(c)." *Celotex,* 477 U.S. at 324. To overcome a motion for summary judgment, the nonmoving party "'may not rely merely on allegations or denials in its own pleadings' but must 'set out specific facts showing a genuine issue for trial.'" For cross-motions for summary judgment, "the Court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir.2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

### III. ANALYSIS

Lansdowne HOA alleges that OpenBand, and its affiliated entities involved in managing and providing video programming services, are subject to the Exclusivity Order, whose clear language prohibits OpenBand's admitted exclusivity with respect to video programming. *See* Exclusivity Order ¶ 31. Defendants respond on both procedural and substantive grounds. Procedurally, defendants contend that Lansdowne HOA does not have either Article III standing or statutory standing under the Act. They also claim that the relief plaintiff seeks is barred by the

11

applicable statute of limitations.  As to the merits of Lansdowne HOA's claim, defendants contend that OpenBand is not subject to the Exclusivity Order because it does not meet the definition of an "OVS operator" and that the status *vel non* of other affiliated entities as an OVS operator, including Multimedia (which defendants concede is an OVS operator), is irrelevant because only OpenBand has entered into a contractual relationship with Lansdowne HOA.  In that connection, defendants claim that the only contract that may be subject to the Exclusivity Order is the TSA (assuming, without conceding, that OpenBand is an OVS operator).  The TSA, however, according to the defendants, does not violate the Exclusivity Order because it does not contain a contractual provision that gives OpenBand an exclusive right to provide video programming services, and in fact expressly acknowledges the right of Lansdowne residents to obtain such services from some other provider.

With respect to OpenBand's exclusive easement, defendants concede that OpenBand "holds an easement that grants it the exclusive right to build, operate and maintain certain telecommunications infrastructure within Lansdowne." Def.'s S.J. Br. 22.[13]  Nevertheless, they dispute that the easement provides any basis upon which to apply the Exclusivity Order against OpenBand because the "[e]asements . . . are real property rights, not contracts to provide video programming service, and are outside the FCC's jurisdiction under the facts and circumstances of this case." *Id.* at 2.  For these reasons, defendants contend that nullifying OpenBand's exclusive easement based on the Exclusivity Order would constitute an unconstitutional governmental taking of property, something the FCC intended to avoid when it issued the Exclusivity Order.  Defendants further claim that to construe and apply the Exclusivity Order in

---

[13] In prior proceedings, defendants conceded that OpenBand's exclusive easement "effectively bar[s] other providers of wired services from Lansdowne." Def.'s Br. in Supp. of Mot. to Dismiss 22.

circumstances that would result in a governmental taking of property, as defendants claim its application to OpenBand's easement would do in this case, would transform the Exclusivity Order into an agency action that exceeds the FCC's rulemaking jurisdiction. For the reasons discussed below, the Court rejects each of defendants' contentions and concludes that the Exclusivity Order reaches and invalidates OpenBand's exclusivity with respect to the provision of video programming services to Lansdowne residents.

### A. Standing

Defendants assert that Lansdowne HOA lacks both Article III standing and statutory standing under 47 U.S.C. § 401(b) to bring this action. For the reasons discussed below, the Court concludes that Lansdowne HOA has both constitutional and statutory standing.

### 1. Article III Standing

Defendants claim that Lansdowne HOA has failed to allege a sufficient "injury in fact" to allow it to challenge the legality of the exclusivity arrangement at issue because the Lansdowne residents, not the homeowners association itself, are restricted in their ability to receive hard-wired video programming from other providers. *See McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010) ("The irreducible constitutional minimum of standing requires (1) an injury in fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical; (2) causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant; and (3) redressability—a likelihood that requested relief will redress the alleged injury." (internal quotations omitted)).[14] Lansdowne HOA claims it has

---

[14] Defendants appear to argue that Lansdowne HOA failed to *allege* injury in its complaint and therefore is now precluded from proving that element of its claim at the summary judgment stage. First, plaintiff has alleged injury, both to itself and to its residents. *See* Compl. ¶ 185 ("[T]he Lansdowne HOA and its resident members have been harmed and continue to be harmed by the continued enforcement, or threat of enforcement, of the exclusive easements."). Second,

standing based on its own rights and injuries and also based on the rights of the Lansdowne

residents under the doctrine of "associational standing."

Lansdowne HOA itself is a consumer of communications services[15] that is restricted in its

ability to arrange for alternative providers of hard-wired video programming. OpenBand's

challenged exclusive easement restricts Lansdowne HOA's ability to permit land-based access to

its own property. Lansdowne HOA is also contractually obligated under the TSA to pay to

OpenBand certain monthly charges for each Lansdowne residential unit, regardless of whether it

can obtain reimbursement from a particular resident on whose behalf it is billed. *See* Def.'s Ex.

17, at 2. For these reasons, the Court finds and concludes that Lansdowne HOA itself has

sustained or is threatened with injury in fact.[16]

Lansdowne HOA also has standing based on the rights of its members, the Lansdowne

residents. "[I]n attempting to secure relief from injury to itself the association may assert the

---

even if the complaint failed to sufficiently allege injury as an element of its claim, that claim for relief survived defendants' motion to dismiss and plaintiff is now entitled, and required, to prove each element of its claim on the merits. *See McKee v. McDonnell Douglas Technical Servs. Co., Inc*, 700 F.2d 260, 265 n.8 (5th Cir. 1983) (holding that courts are not bound by the allegations in the complaint on a motion for summary judgment); *Skelly v. Okaloosa Cnty Bd. of Cnty. Comm'rs*, 456 F. App'x 845, 848 n.6 (11th Cir. 2012) (same); *but cf. McKelvy v. Capital One Servs., LLC*, No. 3:09cv821, 2010 WL 3418228, at *5 n.7 (E.D. Va. Aug. 20, 2010) (holding that a plaintiff is "bound by the allegations in his Complaint and cannot use his opposition to summary judgment to bring new *claims*" (emphasis added)).

[15] Lansdowne HOA purchases video services for the Potomac Club, which is a community center managed by Lansdowne HOA. *See* Pl.'s S.J. Br. 12, at ¶ 32; Pl.'s Ex. 32, at 91-92; Pl.'s Ex. 55, at ¶ 5.

[16] Lansdowne HOA has felt the effects of OpenBand's challenged exclusivity in other ways as well. For example, in 2011, Lansdowne HOA contacted a competing provider of telecommunication services, Verizon, which declined to pursue discussions about becoming a provider in Lansdowne because of OpenBand's exclusivity and the prospect that it would be unable to access the Lansdowne community because of the easement in place. *See* Def.'s Exs. 1, 18, 19, 20.

rights of its members' associational ties." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Whether an association has standing to sue on behalf of its members is a three-part test: "(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977)); *see also Mainstream Loudoun v. Bd. of Trs. of Loudoun Cnty. Library*, 2 F. Supp. 2d 783, 791 (E.D. Va. 1998) (applying the three-part test). Those elements are satisfied here. First, the Lansdowne residents are also restricted in their ability to receive video programming services from an alternative provider. Second, Lansdowne HOA's purposes include making such services available to its members and controlling the access to, and use of, the Lansdowne common property.[17] Enforcement of the Exclusivity Order with respect to OpenBand's exclusivity arrangement would relate to both of those purposes. Third, Lansdowne HOA seeks only declaratory and injunctive relief, not individual damages for each resident. The individual members do not, therefore, need to participate in order to obtain the relief sought. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007) (holding that a suit for a declaratory judgment or injunctive relief, unlike a suit for damages, is the type of relief for which associational standing was recognized). For all of the above reasons, the Court concludes that Lansdowne HOA has Article III standing.

### 2. Statutory Standing

Section 401(b) of the Act provides that if "any person fails or neglects to obey any order of the Commission . . . any party injured thereby . . . may apply to the appropriate district court

---

[17] *See* Pl.'s S.J. Br. 12, at ¶ 31, which is not explicitly controverted by defendants.

of the United States for the enforcement of such order." 47 U.S.C. § 401(b).  The defendants

claim that Lansdowne HOA lacks standing under this provision, so-called "statutory standing,"

on the grounds that the Exclusivity Order is a "rulemaking order," not an "adjudicatory order";

and that § 401(b) creates a private right of action only with respect to adjudicatory orders.  The

Exclusivity Order was the result of rulemaking, pursuant to notice and comment, and not an

adjudication of a particular dispute. Exclusivity Order ¶ 1.  The issue therefore is whether a

rulemaking order such as the Exclusivity Order is enforceable by a private litigant under §

401(b).

Statutory standing depends on "whether a statute creating a private right of action

authorizes a particular plaintiff to avail herself of that right of action," *CGM, LLC v. Bellsouth

Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (quoting Radha A. Pathak, *Statutory Standing

and the Tyranny of Labels*, 62 Okla. L. Rev. 89, 91 (2009)).  The Fourth Circuit has held that

because § 401(b) extends to "any order," a private litigant has standing to enforce both

adjudicatory orders and rulemaking orders. *See CGM,* 664 F.3d at 53 (noting that the Third,

Fourth, and Ninth Circuits permit litigants to enforce rulemaking orders under § 401(b)); *but see

New Eng. Tel. & Tel. Co. v. Pub. Utils. Comm'n of Me.*, 742 F.2d 1, 4-7 (1st Cir. 1984) (holding

that a private right of action under § 401(b) is limited to enforcement of adjudicatory orders only,

and not rulemaking orders).  However, the Fourth Circuit has restricted the scope of § 401(b) to

the enforcement of only those rulemaking orders that "require[] a defendant to take concrete

actions." *Id.* (quoting *Mallenbaum v. Adelphia Commc'ns Corp.*, 74 F.3d 465, 468 (3d Cir.

1996).[18]  "Private enforcement is thus improper when a rule or order is unrelated to specific

---

[18] Defendants misread Fourth Circuit case law to the extent they suggest that it has restricted
enforcement under § 401(b) to adjudicatory orders. *See* Def.'s S.J. Br. 26 ("Even if the Court
does not follow the Fourth Circuit on the threshold issue that Plaintiff cannot file suit based on a

rights or obligations of the litigants and is thus 'more akin to a general rulemaking than to an order.'" *Id.* at 54 (quoting *Mallenbaum*, 74 F.3d at 469). The Exclusivity Order satisfies the requirements for private enforcement under § 401(b).

While the Exclusivity Order includes broad statements of policy, it also specifically defines the rights and obligations that a litigant can enforce. The Exclusivity Order states clearly, and without qualification, what is prohibited: "no cable operator or multichannel video programming distributor subject to Section 628 of the Act shall enforce or execute any provision in a contract that grants it the exclusive right to provide any programming service . . . to a MDU." Exclusivity Order ¶ 31. The Order therefore identifies the parties to whom it applies— those subject to Section 628 of the Act and MDUs—and identifies specifically the rights and obligations between those parties affected—any contractual exclusivity for video programming services is unenforceable. The Exclusivity Order, therefore, has the required degree of specificity to be enforced under § 401(b). *See Hawaiian Tel. Co. v. Pub. Utils. Comm'n of Haw.*, 827 F.2d 1264, 1272 (9th Cir. 1987) (holding that a rulemaking order was enforceable under § 401(b) because the order required that utility companies follow certain defined procedures); *Alltel Tenn., Inc. v. Tenn. Public Service Comm'n*, 913 F.2d 305, 308 (6th Cir. 1990) (holding that a rulemaking order was enforceable under § 401(b) because the order "mandates specific action as to the division of costs to be taken by the telephone companies and regulatory

---

regulatory order . . . .). The Fourth Circuit in *CGM,* and previously in *Chesapeake*, did not foreclose enforcement of a rulemaking order under § 401(b) but, instead, addressed whether the rulemaking order at issue provided the requisite specificity to be enforceable. *See Chesapeake & Potomac Tel. Co. v. Public Serv. Comm'n*, 748 F.2d 879 (4th Cir. 1984) *vacated on other grounds*, 476 U.S. 445 (1986).

agencies."). For these reasons, the Court concludes that private enforcement of the Exclusivity

Order under § 401(b) is appropriate;[19] and Lansdowne HOA has standing to enforce it.

### B. Statute of Limitations

The parties entered into the TSA in 2001 and the plaintiff has known of the effects of the

Exclusivity Order since its issuance in 2007. Based on these facts, defendants contend that this

action, and the relief sought by the Lansdowne HOA, is barred by the applicable statute of

limitations.[20] While a limitations period would apply to claims for damages, Lansdowne HOA is

not seeking damages that may have resulted from a violation of the Exclusivity Order. Rather, it

seeks (1) a declaration that defendants' video exclusivity is void and unenforceable and (2) an

injunction prohibiting the defendants from enforcing that exclusivity. *See* Compl. 47, at ¶ 5. No

statute of limitations applies to these requests for equitable relief. *See Holmberg v. Armbrecht*,

327 U.S. 392, 396 (1946) ("Traditionally and for good reasons, statutes of limitations are not

controlling measures of equitable relief."); *see also United States v. Hobbs*, 736 F. Supp. 1406,

---

[19] The Exclusivity Order stands in stark contrast to the rulemaking order that the Fourth Circuit deemed unenforceable in *CGM*. In that case, the Fourth Circuit held that private enforcement of the FCC's order under § 401(b) was inappropriate because the rights of the parties were not defined in the FCC's order but by private agreements that the parties entered into, as required by that order. *CGM*, 664 F.3d at 49-50, 55. Here, the Exclusivity Order definitively declares the rights and obligations of the parties and is self-executing. *See* Exclusivity Order ¶ 31 ("30 days after publication of this *Report and Order* in the Federal Register, no cable operator or multichannel video programming distributor . . . shall enforce or execute any provision in a contract that grants it the exclusive right to provide any video programming service . . . to a MDU.").

[20] Neither the Exclusivity Order nor the enforcement statute states a limitations period within which to file suit. Defendants claim that Virginia's two-year statute of limitations set forth in Va. Code § 8.01-248 applies to plaintiff's claim for relief under the Exclusivity Order.

1410 (E.D. Va. 1990). For these reasons, the Court concludes that plaintiff's challenge under the Exclusivity Order is not barred by the applicable limitations period.[21]

        C.    The Exclusivity Order's application to the contractual arrangement for video programming.

Having considered and rejected defendants' procedural defenses, the Court next considers the merits of plaintiff's claim that OpenBand's contractual arrangements for the provision of video programming run afoul of the Exclusivity Order. The resolution of that issue requires a two-step analysis. The Court must determine, first, whether the entities involved in providing video programming to the Lansdowne community, either individually or as a group, are subject to the Exclusivity Order; and second, whether the Exclusivity Order prohibits, in whole or in part, the contractual arrangement in place between OpenBand and Lansdowne HOA for the provision of video programming services to Lansdowne residents.

---

[21] Although not raised by the defendants as an affirmative defense, the related doctrine of laches does potentially apply to the equitable relief sought here. *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001). But "[l]aches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)). There is no record evidence of any lack of diligence on the part of Lansdowne HOA or any prejudice to defendants as a result of any unwarranted delay. For example, there is no evidence that after the issuance of the Exclusivity Order, defendants acted in a way they would not have had Lansdowne HOA instituted this enforcement action earlier. *See, e.g., What-A-Burger of Va. v. Whataburger of Corpus Christi, Tex.*, 357 F.3d 441, 449 (4th Cir. 2004) ("Because the Lanham Act does not include a limitations period, courts use the doctrine of laches to address the inequities created by a trademark owner who, despite having a colorable infringement claim, allows a competitor to develop its products around the mark and expand its business, only then to lower the litigation boom."). For the above reasons, the Court concludes that Lansdowne HOA's suit is also not barred by the doctrine of laches.

1. Whether OpenBand is subject to the Exclusivity Order.

The challenged exclusivity with respect to video programming arises out of the TSA and the exclusive easement. OpenBand is the only defendant that is a party to those agreements. The first issue is, therefore, whether OpenBand is subject to the Exclusivity Order.

The Exclusivity Order applies to cable operators and also to common carriers and OVS operators to the extent those two types of entities provide video programming. *See* Exclusivity Order ¶ 51; 47 U.S.C. § 573(c)(1)(A) (explaining that § 548 applies to operators of an open video system). Here, the inquiry is whether OpenBand is an OVS operator.[22] Defendants concede that Multimedia is an OVS operator, but dispute that OpenBand satisfies the definition of an OVS operator. Complicating this dispute is a disagreement over how the applicable definition of an OVS operator is to be construed.[23] The Court concludes that under either parties' interpretation of the applicable definition, OpenBand is an OVS operator, regardless of whether it is considered separate and apart from any other entity or as part of the group of operationally integrated and affiliated entities that deliver video programming services to Lansdowne.

An "OVS operator" is defined as:

> Any person[24] or group of persons who provides cable service[25] over an open video system[26] and directly or through one or more affiliates[27] owns a significant interest in

---

[22] "Cable operator" provides cable services on a "cable system" and an "OVS operator" provides cable services on an "open video system." *See* 47 U.S.C. § 522(5); 47 C.F.R. § 76.1500(b). A cable operator, by definition, excludes an "OVS operator." 47 C.F.R. § 76.5(a)(4). The difference between a cable system and an OVS is essentially that an OVS allows for services other than cable video programming, such as telephone services. *See* 47 U.S.C. §§ 571, 573. The parties agree that the system at issue is an OVS, and not a cable system, and the inquiry is whether OpenBand, or OpenBand in concert with its affiliates, is an "OVS operator."

[23] *See infra* note 28.

[24] "Person" is defined as an "individual, partnership, association, joint stock company, trust, corporation or governmental entity." 47 U.S.C. § 522(15).

such open video system, or otherwise controls or is responsible for the management and operation of such an open video system.

47 C.F.R. § 76.1500(b) (internal footnotes added).[28]

---

[25] "Cable service" is defined as "[t]he one-way transmission to subscribers of video programming, or other programming service; and, subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 C.F.R. § 76.5(ff); *see* 47 C.F.R. § 76.1500(f).

[26] An "open video system" is defined as:

> A facility consisting of a set of transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community, provided that the Commission has certified that such system complies with this part.

47 C.F.R. § 76.1500(a).

[27] Entities "are affiliated if either entity has an attributable interest in the other or if a third party has an attributable interest in both entities." 47 C.F.R. § 76.1500(g). An "attributable interest" includes, *inter alia*, "[a]ctual working control, in whatever manner exercised." 47 C.F.R. § 76.501, Note 1. Here, M.C. Dean has actual working control of both OpenBand and Multimedia and under the applicable definition, defendant M.C. Dean has an "attributable interest" in both Multimedia and OpenBand, thereby making OpenBand and Multimedia affiliates of M.C. Dean and each other. *See also* 47 C.F.R. § 76.501, Notes 2, 5 (defining "attributable interest" further).

[28] Defendants contend the definition of an "OVS operator" should be parsed as follows:

> (1) Any person or group of persons who provides cable service over an open video system; and
>
> (2) directly or through one or more affiliates either (a) owns a significant interest in such open video system, or (b) otherwise controls or is responsible for the management and operation of such an open video system.

Lansdowne HOA interprets that regulatory definition as

> (1) Any person or group of persons who provides cable service over an open video system and directly or through one or more affiliates owns a significant interest in such open video system; or
>
> (2) Any person or group of persons who otherwise controls or is responsible for the management and operation of such an open video system.

First, defendants do not dispute that the video services at issue are "cable services" and that the system through which they are provided to Lansdowne is an "open video system." The issue is whether OpenBand "provides" those services.[29]  Under the TSA, OpenBand has the sole right and the obligation to deliver telecommunications services to Lansdowne, either by doing what is necessary for that purpose itself or by enlisting other entities to do so. In either case, it controls how such services are to be provided and, through its exclusive easement, access to Lansdowne for such services. OpenBand has in fact caused the video services required under the TSA to be provided through various contractual arrangements, including a license to use its exclusive easement and infrastructure, with Multimedia, who acts on OpenBand's behalf as its subcontractor. Under these circumstances, the Court finds and concludes that OpenBand "provides" cable services over an open video system.[30]  Likewise, OpenBand directly owns a

---

The Court concludes that while the defendants' reading is a reasonable one, Lansdowne HOA's interpretation is correct. Significant in this regard is that the regulatory definition of an OVS operator appears intended to track the statutory definition of a "cable operator," and to construe the definition of an OVS operator as defendants propose would interject needless and unwarranted disparities between two functionally equivalent providers of video programming services intended to be regulated under the Exclusivity Order. *See* 47 U.S.C. § 522(5). Nevertheless, the Court concludes that under either interpretation of the regulatory definition, OpenBand is an OVS operator.

[29] Defendants do not contend that OpenBand or any other OpenBand-related entity does not satisfy the definition of a "person."

[30] "Provide" is not a defined term in any of the referenced sources of definitions to be used in connection with the definition of an OVS operator. *See* 47 C.F.R. § 76.1500(i) (stating that "words not defined in this part shall be given their meaning as used in Title 47 of the United States Code, as amended, and, if not defined therein, their meaning as used in Part 47 of the Code of Federal Regulations."). However, OpenBand's activities fall well within the standard meanings of "provide." *See* American Heritage Dictionary 1053 (New College ed. 1976) ("provide" is defined as "[to] supply," "to make available," and "to furnish."); *id.* at 1293 ("Supply" is defined as "to make (something needed, desired, or lacking) available for use" and "[t]o furnish or equip with what is needed or lacking."). Relying on the language of the TSA, defendants argue that because OpenBand only "arranged for the provision" of

significant interest in the OVS system that is used to transmit cable services. *See* Pl.'s Ex. 8, at 3

(explaining, in the TSA, that "'Infrastructure' shall mean the telecommunications infrastructure

located within the Development that is used to deliver the Services. The Infrastructure is owned

by [OpenBand].''); *see also* Pl.'s S.J. Br. 7, at ¶ 18 ("[OpenBand] owns the infrastructure over

which video services are delivered" and "[n]o wireline video can be delivered without using

[OpenBand's] infrastructure.'').[31]   Finally, by virtue of the contractual rights it has to select how

video programming services are delivered to Lansdowne and to control access to Lansdowne for

---

telecommunication services through Multimedia, whose own infrastructure is necessary to
actually deliver video programming to Lansdowne, it does not "provide" video services and
therefore cannot meet the definition of an OVS operator. Whatever legal significance the relied
upon language in the TSA may have for the purposes of the TSA, the Court concludes that it has
none for the purposes of the applicable definition of an OVS operator; and that by "arranging for
the provision" of video programming services through a subcontractor, such as Multimedia,
across OpenBand's own infrastructure contained within its exclusive easement, and in discharge
of its own contractual obligations under the TSA, OpenBand "provides" cable services for the
purposes of satisfying the definition of an OVS operator. This conclusion is supported by
defendants' concession that Multimedia satisfies the definition of an OVS operator, even though
Multimedia, like OpenBand, does not itself own all of the infrastructure necessary to "provide"
video programming to the Lansdowne residents, and, further, has itself contracted "with the
video service content providers whose video programming is made available to Lansdowne."
Def.'s S.J. Br. 15, at n.21; Def.'s Ex. 23.

[31] The infrastructure that OpenBand owns includes:

> "trunks" (i.e., cable runs that are "one of the primary distribution pathways"); "IDF
> headend infrastructure" (i.e., "an intermediate distribution facility, which is a pedestal
> where the signal is either amplified or split or otherwise perpetuated"); "road conduits"
> (i.e. "pipe enclosures that are used to create infrastructure distribution points at major
> road crossings); and "house connection lines" (i.e., "the fiber optics in the boxes running
> to the outside of the house from the IDF.")

Pl.'s S.J. Br. 7, at ¶ 18.

that purpose, OpenBand directly "controls or is responsible for the management and operation of an OVS." For these reasons, the Court finds and concludes that OpenBand is an OVS operator.[32]

The Court also concludes that OpenBand is an OVS operator because it is part of a "group of persons," consisting of OpenBand, OBS, Multimedia, and M.C. Dean, whose activities taken together satisfy the definition of an OVS operator. "Group" is undefined, but under the circumstances of this case, these entities are so closely related they satisfy any reasonable definition of a "group." OpenBand and Multimedia are both contractually obligated with respect to the provision of the same video programming services, both to each other and to Lansdowne and its residents. Under the terms of the TSA, OpenBand agreed to "be the provider or arrange for the provision of the Platform Services to [Lansdowne residents]." Pl.'s Ex. 8, at 4, § 2.1. Under the Multi-Media Services Agreement, Multimedia agreed to provide the required services "on [OpenBand's] behalf," as OpenBand's "qualified subcontractor" for satisfying any regulatory requirements, and as OpenBand's "subcontractor in providing the services [OpenBand] is offering" to Lansdowne residents. Pl.'s Ex. 17, at ¶¶ C, E and § 2.1 (explaining

---

[32] The Court finds no merit to defendants' position that OpenBand fails to satisfy the definition of an OVS operator because, unlike Multimedia, it has not been registered with or been "certified" by the FCC as an OVS operator. By regulation, an "operator of an open video system must certify to the Commission that it will comply with the Commission's regulations" and that the "Commission must approve such certification prior to the commencement of service . . . ." 47 C.F.R. § 76.1502(a). The flaw in defendants' position is that the regulatory *definition* of an OVS operator does not include a certification requirement. This lack of a certification requirement as a definitional element of an OVS operator contrasts with the certification necessary to satisfy the definition of an "open video system," establishing that the authors of this regulatory scheme made certification a part of a regulatory definition when such a qualification was intended. *Compare* 47 C.F.R. § 76.1500(b) *with* 47 C.F.R. § 76.1500(a) (including within the definition of an OVS ". . . provided that the Commission has certified such system complies with this part."). Whatever may be the obligation of an OVS operator to obtain a certification, the regulatory scheme does not require an entity to obtain certification as an OVS operator in order to satisfy the definition of an OVS operator and thereby becomes subject to the Exclusivity Order. To hold otherwise would lead to an absurd result—an entity otherwise subject to FCC regulations could avoid those regulations simply by refusing to certify as required by the FCC.

that Multimedia acts as OpenBand's "appropriately qualified and regulated sub-contractor").

Through the Three-Way Agreement, they also have together entered into contractual

commitments to Lansdowne and each resident with respect to telecommunications services.

Second, OpenBand and Multimedia are necessarily dependent on each other to fulfill

their respective contractual commitments concerning video programming services. OpenBand

has authorized Multimedia to utilize OpenBand's exclusive easement and infrastructure, without

access to which Multimedia could not transmit the video programming to Lansdowne residents.

Multimedia has obligated its own infrastructure and transmission equipment to effect the

delivery of the required video programming services on OpenBand's behalf. Neither OpenBand

nor Multimedia could perform as required without the other; and both operate under the common

control and management of M.C. Dean and OBS. In summary, OpenBand, Multimedia, OBS

and M.C. Dean are contractually, operationally, and legally connected to each other in a manner

that allows them to operate as a single, integrated provider of cable service to Lansdowne

residents. *See Ames v. Heritage Comms., Inc.*, 861 F.2d 185 (8th Cir. 1988) (finding that a parent

and two subsidiaries acted as a single cable operator under the analogous definition of a cable

operator under the Act); *but see Austin v. Sw. Bell Video Servs.*, No. A-98-CA-028, 1998 WL

35401472, at *7 (W.D. Tex. Aug 3, 1998) ("The Cable Act does not transform an entity into a

cable operator merely because it is an affiliate of another entity which owns a cable system.").

For the same reasons, OpenBand is part of a "group of persons" that "directly or through

one or more affiliates own[s] a significant interest in" the open video system over which the

cable service runs. The parties concede that Multimedia, an affiliate and subcontractor of

OpenBand, owns a significant interest in the open video system that provides video

programming to Lansdowne; and as discussed above, OpenBand owns an indispensable portion

of that overall infrastructure necessary to actually transmit video programming to Lansdowne residents. Only through the combined infrastructure owned by OpenBand and Multimedia, with each contractually and operationally connected to the other, can the residents of Lansdowne receive the video programming services. Likewise, OpenBand is part of a group that "controls or is responsible for the management and operation of . . . an open video system." OpenBand is contractually obligated to Lansdowne HOA and its residents for video programming services and therefore is responsible for providing those video programming services; it also controls access to Lansdowne for the purpose of providing those services. Multimedia is contractually committed to OpenBand and also, through the Three-Way Agreement, to the Lansdowne residents. And as discussed earlier, M.C. Dean has overall management control of OpenBand and Multimedia's video programming service obligations. *See supra* Part I.A.

For the above reasons, the Court finds and concludes that OpenBand is part of a "group of persons" that meets the definition of an OVS operator and therefore is itself an OVS operator subject to the Exclusivity Order.[33]

---

[33] Defendants argue that it is improper to treat OpenBand, Multimedia, and M.C. Dean as a single group for the purpose of subjecting OpenBand to the Exclusivity Order since they are distinct business entities, with separate corporate identities, formed for legitimate business purposes unrelated to any attempt to evade regulation or engage in any improper conduct. For these reasons, the defendants argue that there is no basis to disregard their separate corporate identities under the doctrine of piercing the corporate veil or otherwise. Without deciding any of the factual issues implicit in the defendants' position, the Court finds those arguments irrelevant. The Court is not disregarding the separate business identities of these entities in finding that they constitute a "group" within the definition of an OVS operator. Rather, the Court bases that decision on the undisputed facts that they act in a centralized, integrated, and coordinated fashion, as described above, for the provision of video programming services to Lansdowne. For the same reasons, the Court rejects defendants' arguments based on this Court's decision in *UCA, L.L.C. v. Lansdowne Cmty. Dev., LLC*, 215 F. Supp. 2d 742, 756 (E.D. Va. 2002). There, the Court held, based on the applicable definition of a "utility," that defendants were "distinct and separate entities"; and, as a result, their common ownership, by itself, did not convert OpenBand into a "utility" for the purpose of obtaining access to a competitor's transmission lines under the Pole Act simply because one of its related entities met the definition of a "utility."

2. Whether the Exclusivity Order prohibits OpenBand's contractual arrangements for video programming services to Lansdowne residents.

The final issue for the Court to decide is whether the Exclusivity Order invalidates those aspects of the contractual arrangement that result in OpenBand's exclusivity with respect to the provision of video programming services to Lansdowne residents. The Court concludes that the clear language of the Exclusivity Order reaches and invalidates the video programming exclusivity that OpenBand enjoys as a result of the TSA, and the CC&Rs and the exclusive easement which are effectively incorporated into the TSA.

The Court begins its analysis with the language of the Exclusivity Order itself. As discussed above, the Exclusivity Order contains the blanket prohibition that no MVPD, which includes an OVS operator, "shall enforce or execute any provision in a contract that grants it the exclusive right to provide any video programming service . . . to a MDU." Exclusivity Order ¶ 31. An MDU includes "centrally managed real estate developments." *See* Exclusivity Order ¶ 7.[34] There is no dispute that Lansdowne is "a centrally managed residential real estate development." The issue reduces to whether the TSA, CC&Rs, or OpenBand's exclusive

---

Here, the Court bases its ruling on a different set of applicable definitions, not simply the defendants' affiliation or any notion that their separate identities should be disregarded. *Compare* 47 U.S.C. § 224(a)(1) (Pole Act definition of a "utility") *and* 47 U.S.C. § 224(f)(1) ("A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way *owned or controlled by it.*" (emphasis added)) *with* 47 C.F.R. § 76.1500(b) ("Any person or *group of persons* who provides cable service over an open video system and directly or through one or more affiliates owns a significant interest in such open video system . . . ." (emphasis added)).

[34] "[T]he term MDUs, for purposes of this *Report and Order*, also includes gated communities, mobile home parks, garden apartments, and other centrally managed residential real estate developments. All of these are collections of private individual households with residents remaining for lengthy, indefinite periods of time, each in a dwelling space that is distinctly separate but shares some common spaces requiring central management." Exclusivity Order ¶ 7 (internal citations omitted).

easement is, or all three taken together are, a contract that contains a "provision that grants [OpenBand] the exclusive right to provide any video programming service . . . to a MDU."

As discussed above, the TSA sets forth a contractual arrangement for the provision of, among other things, video programming services "so that the HOA shall not engage any other provider of Platform Services." The TSA also made the CC&Rs enforceable contractual commitments between Lansdowne HOA and OpenBand. *See* Pl.'s Ex. 8, at 13, § 6.4(l) (stating that Lansdowne HOA covenants "not to amend the CC&Rs such that the amendment would (i) result in a termination of this Agreement or allow the HOA to terminate this agreement or (ii) have a materially adverse effect on [OpenBand]."). Among the restrictions in the CC&Rs made enforceable against Lansdowne HOA, through the TSA, are OpenBand's exclusive telecommunications easement as well as the prohibition on Lansdowne HOA's granting other easements or taking action that would interfere with "the exclusive rights of [OpenBand]." *See, e.g.,* Pl.'s Ex. 9, at §§ 3.8(e), 4.7.1, 4.7.2, 8.1.1(v), 8.1.3(i), 8.1.4(i); 8.1.10(c). As a result, OpenBand would breach the TSA itself if it amended the CC&Rs in a way that affected the exclusivity of OpenBand's easement. Overall, these agreements—the TSA, the CC&Rs, and OpenBand's exclusive easement—are inextricably related, entered into within a short period of time of each other, and contractually joined together in one document, the TSA, all for the purpose of establishing a unitary contractual matrix of interlocking obligations that create an impregnable, exclusive enclave for OpenBand's delivery of wired telecommunication services at Lansdowne. *See Va. Hous. Dev. Auth. v. Fox Run Lmtd. P'ship*, 255 Va. 356, 364-65 (1998) (recognizing that "notes and contemporaneous written agreements executed as part of the same transaction will be construed as forming one contract. . . . So long as neither document varies or contradicts the terms of the other, terms of one document which clearly contemplate the

28

application of terms in the other may be viewed as representing the complete agreement of the parties."). As a result, the TSA, through its own terms, effectively prevents Lansdowne HOA from granting wired access to competing cable companies, precisely the situation addressed and prohibited by the Exclusivity Order.[35] For these reasons, the Court concludes that the TSA contains prohibited contractual clauses that grant OpenBand the exclusive right to provide video programming services to Lansdowne residents.

Alternatively, the Court concludes that the Exclusivity Order reaches and voids OpenBand's exclusive easement directly, independently of the TSA, to the extent it operates to prevent access to Lansdowne residents by other providers of video programming services. First, OpenBand's exclusive easement constitutes a contract between OpenBand and Lansdowne HOA and is recognized as a contractual instrument under Virginia law. *See Fox Run*, 255 Va. at 364-65 (construing deeds and contemporaneous documents as a single contract); *Mathews v. PHH Mort. Corp.*, 724 S.E.2d 196, 200 (Va. 2012) ("A deed of trust is construed as a contract under Virginia law."); Pl.'s Ex. 4, at 1 (identifying the exclusive easement document as a "deed of easement."); *see also* Def.'s Reply in Supp. of Mot. to Dismiss 18 (stating in the motion to dismiss "[t]hat easements are contracts is undisputed."); Summ. J. Hrg Tr. 26 (conceding at the summary judgment hearing that "we have a contractual provision in the form of a real property agreement that provides an exclusive right of enjoyment of the property . . . ."). Second, the language of the easement itself is replete with references that link OpenBand's exclusive easement to OpenBand's exclusive right to provide telecommunication services to Lansdowne.

---

[35] Also for this reason, any right a Lansdowne resident has under the TSA to secure wireline video programming services from alternate providers is largely illusory given OpenBand's right under the TSA to select which provider will serve the Lansdowne community, and through its exclusive easement, OpenBand's right to preclude access to Lansdowne by any other competing provider.

*See, e.g.*, Pl.'s Ex. 4, at § 2(a) (referencing the "[e]xclusive easement for the purpose of . . . operating . . . telecommunications . . . lines . . . for the . . . provision and distribution of video . . . communications . . .); Pl.'s Ex. 19, at 2 ("[P]ursuant to the blanket easement and rights contained in the Provider's Telecommunications Easements, [OpenBand] has the right to exclusively provide telecommunication services" to the Lansdowne Community); *id* at 4 ("[T]his Modification and Plat shall in no way change (or be deemed to), reduce or modify . . . (ii) the rights of [OpenBand] to be the sole exclusive person or entity to Administer and Operate Utilities on, under and across the entire portion" of the Lansdowne development."). Under these undisputed facts, the Court concludes that OpenBand's easement constitutes a "contract that grants it the exclusive right to provide any video programming service . . . to a MDU."

In concluding that the Exclusivity Order prohibits the exclusivity that OpenBand has with respect to video programming services, the Court has considered defendants' claim that OpenBand's exclusive easement is beyond the reach, or should be deemed beyond the reach, of the Exclusivity Order. First, there is nothing in the Exclusivity Order itself that exempts its application to, or places beyond its reach, private easements or contracts that create property rights. The Exclusivity Order covers all "contracts containing clauses" that give an OVS operator the exclusive right to provide video services. Here, OpenBand's easement is central to and inextricably bound up with OpenBand's contractual ability to provide video services on an exclusive basis.

Second, nothing in the underlying FCC proceedings suggests in any way that the FCC intended to exclude the Exclusivity Order's application where its enforcement would affect an OVS operator's property interests. In fact, those referenced proceedings provide strong evidence that the FCC issued its Order in contemplation of its application to precisely the type of

exclusive easement granted to OpenBand. In this regard, during its proceedings leading up to the

issuance of the Exclusivity Order, the FCC considered a variety of arrangements and methods

used to bar entry into an MDU by a competitor. Among those considered were exclusive

easements similar to that at issue in this case, which the FCC considered to be examples of "the

most exclusionary exclusivity clauses."[36] In fact, there is nothing to suggest that the FCC

distinguished or intended to treat differently (1) an exclusive right to provide video services and

(2) an exclusive easement or other mechanism that bars a competitor's access to a MDU for the

purpose of providing video services. *See* Exclusivity Order ¶ 1, at n.2 (explaining that the Order

was addressing the "most exclusionary exclusivity clauses" that have the effect of prohibiting

"any other MVPD from any access whatsoever to the premises of the MDU building or real

estate development."). It is hard to square defendants' position with the FCC's specific reference

to exclusive easements or other access-barring mechanisms as examples of arrangements the

Exclusivity Order would invalidate.

  Nor can the Court draw the defendants' proffered inferences from the Exclusivity Order's

explicit recognition that it does not *affirmatively* require property owners, such as the Lansdowne

HOA or its residents, to make their residential premises accessible to every, or even any, video

services provider who wants access. OpenBand is not a residential community property owner;

and the Exclusivity Order in no way suggests that it is not to be applied where invalidating a

prohibited contractual arrangement would affect the property rights of an offending video

---

[36] *See* Exclusivity Order ¶ 1, at n.2 (referencing AT&T's comments at page 11, which discuss exclusive easements); Pl.'s Ex. 79, at Exs. B and C (AT&T's referenced comments, including copies of the discussed exclusive easements). For example, Exhibit C to AT&T's comments reference a homeowners association's grant to a telecommunications provider of "an exclusive easement in perpetuity as permitted by law for the Services in, on, over, under, within, and through those portions of the Development set aside for utility service for the Units." Pl.'s Ex. 79, at Ex. C, ¶ 13; *see also* Pl.'s Ex. 79, at Ex. C, ¶ 4.

services provider. The Court also finds no support for the defendants' position based on the

Exclusivity Order's discussion of governmental takings, in which the FCC dismissed concerns

that the Exclusivity Order would lead to a physical condemnation of land or a regulatory taking.

*See* Exclusivity Order ¶¶ 55-59. Rather than suggest that the FCC intended that the Exclusivity

Order not be applied to exclusive easements, that discussion supports the view that the FCC

contemplated the application of the Exclusivity Order to easements.[37]   For all of these reasons,

the application and enforcement of the Exclusivity Order in this case would address precisely a

circumstance that motivated the FCC to act; and it would be anomalous that a provider of video

programming services could so easily evade the FCC's broad and comprehensive remedial order

merely by structuring its prohibited exclusivity as defendants have done here.

Ultimately, whether the application of the Exclusivity Order will cause a taking or

whether the FCC would have jurisdiction to issue an Order that results in a taking becomes

irrelevant for the purposes of this action; this Court has no jurisdiction or authority to invalidate

the Exclusivity Order or withhold its otherwise appropriate or required application on the

grounds that its application would result in a taking.  Likewise, this Court has no jurisdiction to

consider whether the FCC exceeded its authority in promulgating the Exclusivity Order, even if

it does affect real property rights under state law.  Rather, Congress chose to place original

jurisdiction for that purpose in the courts of appeals. *See* 28 U.S.C. § 2342(1); *Palumbo v. Waste*

*Techs. Indus.*, 989 F.2d 156, 160-61 (4th Cir. 1993) ("Generally, when jurisdiction to review

administrative determinations is vested in the courts of appeals these specific, exclusive

jurisdiction provisions preempt district court jurisdiction over related issues under other

---

[37] Notably, within its takings analysis, the Order *again* cites to the page of AT&T's comment discussing exclusivity easements. *See* Exclusivity Order ¶ 56, at n.181.

statutes."); *GTE S., Inc. v. Morrison*, 199 F.3d 733, 742-44 (4th Cir. 1999) (rejecting an attempt to collaterally challenge the FCC's authority to promulgate a certain rule on the basis that the rule would result in an unconstitutional taking).  Nor is the wisdom or even fairness of the Exclusivity Order, either on its face or as applied, reviewable in this Court.  The Court's task is to determine based on its terms whether the Exclusivity Order is to be applied.

The Court does understand that in advancing these arguments, the defendants seek to have this Court interpret the Exclusivity Order in a manner that avoids these potential issues and ancillary claims and proceedings.  Towards that end, the defendants advance the contention that the Order is ambiguous and susceptible to two interpretations, one that reaches easements and one that does not; and that in resolving that ambiguity the Court should consider that when Congress intends to grant to the FCC the power to effect a taking (which defendants assume will occur here through application of the Exclusivity Order), it does so expressly.  Because § 548 does not expressly grant to the FCC the power to effect a taking under that section, defendants contend that Congress did not intend to grant such a power. *See Media Gen. Cable of Fairfax, Inc. v. Sequoyah Condo. Council of Co-Owners*, 737 F. Supp. 903 (E.D. Va. 1990) *aff'd* 991 F.2d 1169 (4th Cir. 1993).

The Court does not find the Exclusivity Order ambiguous in any material respect.  In any event, defendants' remedy, were there a taking as a result of the Exclusivity Order's application, is to seek compensation in other proceedings. *See* Tucker Act, 28 U.S.C. § 1491; *see also Preseault v. I.C.C.*, 494 U.S. 1, 13 (1990) ("[W]e have always assumed that the Tucker Act is an 'implie[d] promis[e]' to pay just compensation which individual laws need not reiterate" (quoting *Yearsley v. W.A. Ross Const, Co.*, 309 U.S. 18, 21 (1940)); *id.* at 12 ("The proper inquiry is not whether the statute expresses an affirmative showing of congressional intent to

33

permit recourse to a Tucker Act remedy, but rather whether Congress has in the statute *withdrawn* the Tucker Act grant of jurisdiction to the Claims Court to hear a suit involving the statute founded . . . upon the Constitution." (internal quotations and brackets omitted)). The Supreme Court has made clear that courts should not construe a regulatory scheme so as to avoid a "takings question" because affected parties have a remedy for compensation under the Tucker Act. *See United States v. Riverside Bayview Homes*, 474 U.S. 121, 127-29 (1985) ("[T]he possibility that the application of a regulatory program may in some instances result in the taking of individual pieces of property is no justification for the use of narrowing constructions to curtail the program if compensation will in any event be available in those cases where a taking has occurred."); *United States v. Sasser*, 967 F.2d 993, 998 (4th Cir. 1992) (pointing to the Tucker Act as the appropriate remedy for a taking, rather than interpreting a regulatory scheme to avoid a taking). For these reasons, the absence of an express authorization to effect a taking means nothing helpful to the defendants' position.

## IV. CONCLUSION

For the above reasons, the Court concludes as a matter of law based on undisputed facts that the contractual arrangement in place between Lansdowne HOA and OpenBand, including the TSA, the CC&Rs, and the exclusive easement, contains contractual clauses that grant to OpenBand the exclusive right to provide wired video programming services to Lansdowne residents and that such clauses violate the Exclusivity Order. Accordingly, the Court declares those provisions "null and void" to the extent of any such exclusivity and it will enjoin the defendants from enforcing those contractual arrangements for the purpose of allowing OpenBand, Multimedia, or M.C Dean to continue providing wired video programming services on an exclusive basis to Lansdowne residents.

34

The Court will issue an appropriate order.

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel of record.

_____
/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 27, 2012